# MICHAEL CARL GEORGE

## V.

# COMMONWEALTH OF VIRGINIA

Record Nos. 910478 and 910580

November 8, 1991

Present: All the Justices

*Donald E. Coulter; Ronald Fahy (Coulter, Foldenauer & Faust,* on brief), for appellant.
*John H. McLees, Jr., Assistant Attorney General (Mary Sue Terry, Attorney General,* on brief), for appellee.

CHIEF JUSTICE CARRICO delivered the opinion of the Court.

In a bifurcated trial conducted pursuant to Code §§ 19.2-264.3 and -264.4, a jury convicted Michael Carl George of capital murder in the commission of robbery while armed with a deadly weapon, Code § 8.2-31(4), and fixed his punishment at death, predicated upon both "vileness" and "future dangerousness." The jury also convicted George of robbery, abduction with intent to defile, and use of a firearm in the commission of capital murder, with punishment fixed at imprisonment for fifteen years, life, and two years, respectively.[1]

After considering a post-sentence report prepared by a probation officer, Code § 19.2-264.5, the trial court imposed the sentences fixed by the jury. George is here for automatic review of his death sentence, and we have consolidated that review with his appeal of his capital murder. conviction. Code § 17-110.1. We have also certified from the Court of Appeals George's convictions for the non-capital offenses with which he was charged, Code § 17-116.06, and we have given the entire matter priority on our docket, Code § 17-110.2.

The victim, fifteen-year-old Alexander Eugene Sztanko, lived with his parents in the City of Manassas. The family recently had moved from a home on Cardinal Drive in Woodbridge, and on Saturday, June 16, 1990, Alex and his parents went to the Woodbridge house to move "out all of the things [they had left] there."

After arriving at the Cardinal Drive address, Alex decided to ride his motorcycle along a power-line easement that crossed his parents' property and extended into a nearby wooded area traversed by a number of trails. Mr. and Mrs. Sztanko last saw Alex alive about 2:00 p.m., when he rode into the woods. "[M]aybe half an hour [or] an hour" later, Alex's father heard "two shots coming from the [wooded] area."

About 10:45 a.m. the next day, Corporal Joseph Dillon of the Prince William County Police Department, who was aware that Alex Sztanko was missing, observed a silver and blue Ford Bronco parked off the side of Cardinal Drive near the woods into which Alex had ridden. Dillon had seen the vehicle parked in the same location about 3:30 p.m. the day before. Dillon pulled in behind

---

[1] George was also indicted for unlawfully possessing or transporting a firearm after having been convicted of a felony involving the use of a firearm. Code § 18.2-308.2. He was not tried by the jury, however, but by the trial court sitting without a jury. The court found him guilty and sentenced him to five years' imprisonment. This conviction is before us in this appeal, and we will consider and dispose of it along with the cases tried by the jury.

the vehicle, "ran the tag" through the Department of Motor Vehicles, and learned that the Bronco was registered in the name of Michael George.

Dillon then observed a "camouflage-clad subject" walking toward him from the south side of Cardinal Drive. The person started toward Dillon, turned and ran eastwardly along the shoulder of Cardinal Drive, and entered the woods. When about ten feet into the woods, the person "knelt down for . . . a few seconds, then came up and walked quickly deeper into the woods . . . and . . . turned and started walking in [Dillon's] direction." The person was "crouched as he was moving through the woods," making it appear to Dillon that he did not want to be seen.

"[S]haking very badly" and "sweating profusely," the person identified himself as Michael George, said he was looking for a place to go turkey hunting, and asked Dillon, "I'm not trespassing, am I?" Because the two "were standing right under [a] no trespassing sign," Dillon said, "[w]ell, according to this, obviously you are."

When Dillon asked George whether he had been in the area the day before, George replied forcefully in the negative. But when Dillon said he had seen George's vehicle there the day before and had observed the "tag on it," George said, "[o]h, yeah, I was here yesterday."[2]

Dillon called for assistance, and, when another unit responded, he placed George under arrest for trespassing. After another officer had transported George from the scene, Dillon walked to the spot in the woods where George had "knelt down." There, Dillon found a pair of black tennis shoes, later identified as belonging to Alex Sztanko.

Dillon left the tennis shoes undisturbed. A bloodhound was brought to the scene and taken to the shoes. From that point, the dog led the police back to George's Bronco and then "right up through the woods" to where Alex Sztanko's body was located. The body was shoeless but otherwise clothed.

An autopsy revealed that Alex had suffered a single gunshot wound to the head, causing immediate loss of consciousness and rapid death. The autopsy also revealed abrasions of the penis which, in the opinion of the medical examiner, were consistent

---

[2] In fact, Dillon had not noted the license number of George's vehicle the day before but had indicated otherwise to George in "an effort to get his response."

with an "electrical burning." Other expert testimony showed that Alex was still alive when the injuries to his penis were inflicted and that the "injuries would have been terribly painful."

Laboratory examination of substances taken from Alex's clothing and body showed the presence of seminal fluid on his T-shirt and thigh, although the origin of this fluid could not be determined. A similar examination of "pubic area swabs and . . . stains from [George's] underpants" showed the presence of seminal fluid "consistent with . . . Mr. George and different from Mr. Sztanko." George's camouflage pants were stained with blood inconsistent with his blood type but consistent with Alex's. Fibers found on Alex's T-shirt were consistent with the material from which George's camouflage jacket was made.

At the time of his arrest, George was carrying a sheath knife, various keys, including a handcuff key, and a topographical map bearing a hand-drawn "x" corresponding to the spot where Alex's body was discovered and a hand-drawn "o" corresponding to the location where his motorcycle was found. A search of George's Bronco revealed a machete, a tear gas canister, and an electrical stun gun capable of producing the "electrical burning" of Alex's penis.

A search of George's room in his parents' home produced a pair of handcuffs. The key taken from George at the time of his arrest fit the handcuffs. Also found in George's room was a fully loaded nine millimeter pistol. Expert testimony established that this pistol fired the shot which caused Alex Sztanko's death.

While incarcerated awaiting trial, George told Roger Settle, a cellmate, that he had "stopped [Alex Sztanko] and got his attention," then "grabbed [him] and dragged him off of his bike back into the woods . . . to have sex with [him]." George also told Settle that he sodomized Alex, "stunned the boy in his private parts several times," and "shot [him] in his head."

I.

ISSUES PREVIOUSLY RESOLVED.

■ George makes several arguments on appeal that have been answered by previous decisions of this Court. However, he has not advanced sufficient reason to justify a departure from the views previously expressed, and we can perceive of none. Accordingly, we will reaffirm our earlier decisions and reject George's argu-

ments. The arguments George makes and decisions answering them are as follows:

The death penalty constitutes cruel and unusual punishment. Answered by *Smith* v. *Commonwealth*, 219 Va. 455, 476, 248 S.E.2d 135, 148 (1978), *cert. denied*, 441 U.S. 967 (1979).

Virginia's "vileness" and "dangerousness" predicates for imposition of the death penalty fail to guide the jury's discretion. Answered by *Smith*, 219 Va. at 476-78, 248 S.E.2d at 148-49.

The use of prior convictions to establish future dangerousness constitutes double jeopardy. Answered by *Watkins* v. *Commonwealth*, 238 Va. 341, 352, 385 S.E.2d 50, 56 (1989), *cert. denied*, 494 U.S. 1074.

Virginia has no meaningful appellate review of death sentence cases. Answered by *Stockton* v. *Commonwealth*, 241 Va. 192, 216, 402 S.E.2d 196, 210 (1991).

The Virginia statutory scheme does not require the trial judge and jury to specify the findings justifying imposition of the death sentence. Answered by *Watkins* v. *Commonwealth*, 229 Va. 469, 490-91, 331 S.E.2d 422, 438 (1985), *cert. denied*, 475 U.S. 1099 (1986).

Additional peremptory challenges are necessary in a capital case to insure a defendant the effective assistance of counsel, the right to a fair and impartial jury, and the reliability of the verdict. Answered by *Buchanan* v. *Commonwealth*, 238 Va. 389, 405, 384 S.E.2d 757, 767 (1989), *cert. denied*, 493 U.S. 1063 (1990).

Trial court's refusal to appoint an expert investigator violated due process and equal protection. Answered by *Gray* v. *Commonwealth*, 233 Va. 313, 330, 356 S.E.2d 157, 166, *cert. denied*, 484 U.S. 873 (1987).

Refusal of trial court to provide funds to employ expert witnesses to assist defense in sentencing phase constituted a denial of due process and equal protection. Answered by *O'Dell* v. *Commonwealth*, 234 Va. 672, 686-87, 364 S.E.2d 491, 499, *cert. denied*, 488 U.S. 871 (1988).

## II.

### PRETRIAL MATTERS.

#### A.   Motions to Suppress.

##### 1.   Statement Made to Officer Dillon.

George contends that the statement he made to Officer Dillon on June 17, 1990, wherein he admitted he had been in the woods near Cardinal Drive the previous day, should have been suppressed because it was obtained without benefit of the warnings required by *Miranda* v. *Arizona*, 384 U.S. 436 (1966). George argues that the statement was made during custodial interrogation. To support this argument, George maintains that Officer Dillon admitted during the hearing on the motion to dismiss that he had decided to make an arrest when "the officer first approached George to question him."

The record does not support George's argument. Officer Dillon stated clearly that he did not decide to make an arrest until after completion of the conversation in which George made his admission concerning the previous day and after Dillon had "walked back to [his] car and was running information" about the registration of the Bronco. Only then, Dillon testified, would he have restricted George's liberty.

■ The trial court found specifically that George "was not in custody at the time the statements in question . . . were made," and the evidence supports that finding. Furthermore, even had Dillon decided to make an arrest prior to George's admission, the officer had not given George any reason to think an earlier arrest was about to occur. "A policeman's unarticulated plan [to arrest a suspect] has no bearing on the question whether [the] suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer* v. *McCarty*, 468 U.S. 420, 442 (1984). Hence, the trial court did not err in refusing to suppress George's statement.

##### 2.   Evidence Seized Pursuant to Search Warrant.

■ George complains that after he was arrested and counsel was appointed to represent him, the Commonwealth improperly obtained and executed a search warrant for his residence. George

contends he was entitled to notice and hearing before the search warrant was issued. We disagree with George.

It is noteworthy that George cites no authority in support of this contention, and we have found none. On an analogous point, in *Drewry v. Commonwealth*, 213 Va. 186, 191 S.E.2d 178 (1972), we rejected the defendant's contention that "photographic identification in the absence of and without notification to his counsel violated his Sixth Amendment rights." *Id.* at 188, 191 S.E.2d at 180. We quoted with approval from *United States v. Bennett*, 409 F.2d 888, 899 (2d Cir.), *cert. denied sub nom., Haywood v. United States*, 396 U.S. 852 (1969), where the Second Circuit said that to "require that defense counsel be allowed or appointed to attend out-of-court proceedings where the defendant himself is not present would press the Sixth Amendment beyond any previous boundary." 213 Va. at 189, 191 S.E.2d at 181.

### 3. Evidence of Cruelty to Animals.

George unsuccessfully sought by pretrial motion to exclude from the sentencing phase evidence that he had been cruel to animals some twenty years earlier. George says that the evidence was inadmissible because of the lack of notice of the Commonwealth's intention to proffer it, the "time gap" involved, and "the emotional aspects of the alleged cruelty."

We disagree with George. He was given ample notice of the Commonwealth's intention to introduce the evidence in question. In an answer to George's motion for discovery, the Commonwealth stated some two months before trial that it would introduce "evidence the defendant had a history of cruelty to animals," and George was given a hearing on his motion to suppress the cruelty-to-animals evidence more than two weeks before trial.

The "time gap" of twenty years affected only the weight to be afforded the evidence, not its admissibility. And, while the evidence may have had "emotional aspects," it was relevant to a determination of "future dangerousness," indicating, as the Attorney General terms it, "a life-long character flaw." It is essential in determining the probability of a defendant's future criminal conduct " 'that the jury have before it *all possible relevant information* about the individual defendant whose fate it must determine.' " *J. Watkins v.* Commonwealth, 229 Va. at 487, 331 S.E.2d at 436 (quoting *LeVasseur v. Commonwealth*, 225 Va. 564, 594, 304 S.E.2d 644, 660 (1983), *cert. denied*, 464 U.S. 1063

(1984)) (quoting *Jurek* v. *Texas*, 428 U.S. 262, 276 (1976) (emphasis added in *LeVasseur*)).

## III.

## JURY MATTERS.

### A. Change of Venue.

George argues that the trial court erred in refusing to order a change of venue. George says that newspaper articles regarding the victim were "as extensive as many victim impact statements and those regarding the crime [were] highly inflammatory with extensive comment on [George's involvement in] previous high publicity crimes." George points out that from a venire of thirty-two persons, six were excluded for cause on account of previously obtained knowledge. In all, George maintains, twenty of the thirty-two veniremen "were aware of the case and almost twenty percent expressed feelings" resulting in their exclusion.

■ We do not think the trial court erred in refusing to order a change of venue. What was said in *Dobbert* v. *Florida*, 432 U.S. 282 (1977), is pertinent here:

> [E]xtensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair. Petitioner in this case has simply shown that the community was made well aware of the charges against him and asks us on that basis to presume unfairness of constitutional magnitude at his trial. This we will not do in the absence of a "trial atmosphere . . . utterly corrupted by press coverage."

432 U.S. at 303 (quoting *Murphy* v. *Florida*, 421 U.S. 794, 798 (1975)).

■ Nor will we make such a presumption here. Indeed, in Virginia,

> [i]t is presumed that a defendant can receive a fair trial in the locality where the offense occurred, and the burden is on the accused to overcome that presumption by clearly demonstrating widespread prejudice against him. The trial court's discretion in ruling upon such a motion will not be disturbed in the absence of a clear showing of abuse.

*LeVasseur*, 225 Va. at 577, 304 S.E.2d at 651 (citations omitted). We do not think George clearly demonstrated widespread prejudice against him, and, hence, he did not overcome the presumption that he could receive a fair trial in Prince William County. And the result is not changed because of the pretrial publicity concerning the victim. Nor are we persuaded by the fact that twenty percent of the veniremen were disqualified because of their prior knowledge of the case. Given the shocking nature of the offense with which George was charged, we think the disqualification rate is surprisingly low. *See Greenfield* v. *Commonwealth*, 214 Va. 710, 716-17, 204 S.E.2d 414, 419-20 (1974) (intensive press coverage of murder; fourteen of thirty-seven prospective jurors, or 37.84%, stricken for cause; not error to deny change of venue).

### B.   Juror Exclusion.

Upon voir dire examination, prospective juror Temple Lee Darry volunteered this information:

> I do have one thing to say. My son was a pallbearer for this young man that was killed. But I didn't really know the young man or the family. I don't feel that that would affect me in making a decision.

Later, Darry made this statement:

> Initially, I guess, because my son did go to that funeral, I felt that what if the guy did what they said he did, that was terrible. And then I got in here and he said he was — he pleaded innocent. So I felt that at least I owe him the option of listening to what he has to say.

In other parts of his voir dire examination, Darry said he had not met Alex Sztanko, had not discussed the case with his son, had formed no opinion as to the guilt or innocence of the accused, and if the jury convicted the defendant of capital murder, he would consider voting for a sentence less than death. Darry said further that while he had learned something about the case from television, he had no knowledge concerning the details. Finally, he said that despite the fact his son was a pallbearer at the victim's funeral, he thought he could still be open minded about the case.

■ In denying George's motion to exclude Darry, the trial judge stated that he thought Darry had been "very candid in the responses he has given," considering "the tone of his voice and his speech and the pitch of his voice when he was answering." We "give deference to [a] trial court's decision whether to retain or exclude individual veniremen because the trial court 'sees and hears the juror.'" *Eaton* v. *Commonwealth*, 240 Va. 236, 246, 397 S.E.2d 385, 391 (1990) (quoting *Wainwright* v. *Witt*, 469 U.S. 412, 426 (1985)). And the trial court's decision in the matter will not be disturbed unless manifest error is shown. *Eaton*, 240 Va. at 246, 397 S.E.2d at 391.

Darry was not automatically disqualified from acting as a juror on account of the fact his son had served as a pallbearer at Alex Sztanko's funeral. *See Stockton* v. *Commonwealth*, 241 Va. at 199-200, 402 S.E.2d at 200 (not error to refuse to exclude for cause prospective juror who was member of organization formed by his wife and daughter to publicize and solve murder of his grandson and other young victims). Rather, whether Darry was disqualified was a matter for exercise of the trial court's discretion.

The standard to be applied by the trial court in determining whether to retain a venireman on the jury panel is whether his answers during *voir dire* examination indicate to the court something that "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."

*Eaton*, 240 Va. at 246, 397 S.E.2d at 391 (quoting *Adams* v. *Texas*, 448 U.S. 38, 45 (1980)).

■ We think the circumstances justify the finding that there was nothing in Darry's voir dire examination sufficient to prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. Accordingly, we find no manifest error or abuse of discretion on the part of the trial court in refusing to exclude Darry for cause.

## IV.

## GUILT PHASE.

### A.   Evidence Relating to Stun Gun.

George argues that the trial court improperly admitted evidence "of the use of a stun gun on the victim during the trial phase as opposed to the sentencing phase." This evidence, George says, was irrelevant and prejudicial, and its prejudicial effect outweighed its probative value.

■ We disagree with George. The gun was found by the police in George's Bronco after Alex Sztanko's murder. Alex's body bore injuries consistent with electrical burns. Expert testimony showed that the gun, which produces an "arc of electricity," could "cause a burn." Hence, the gun connected George with the murder and, for this reason, the challenged evidence was relevant to the issue of George's guilt or innocence, was more probative than prejudicial, and was properly admitted.

### B.   Evidence Relating to Robbery.

The issue here is one of sufficiency of evidence. No assignment of error questions the admissibility of any evidence relating to robbery.

George argues "there was absolutely no evidence that a robbery ever occurred." Hence, he maintains, the trial court erred in refusing to strike the evidence with respect to robbery and capital murder in the commission of robbery and in instructing the jury on the elements of robbery. On the other hand, the Commonwealth argues that the "evidence supports the jury's verdict that George had robbed his victim of his wallet, the two twenty-dollar bills kept therein, his shoes, his motorcycle, and his helmet."

■ Although the punishment for robbery is fixed by statute, Code § 18.2-58, the offense is not statutorily defined, and we must look to the common law for its definition. "Robbery at common law is defined as the taking, with intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation." *Pierce* v. *Commonwealth*, 205 Va. 528, 532, 138 S.E.2d 28, 31 (1964).

■ Murder in the commission of robbery is a killing which takes place before, during, or after the robbery and is so closely related thereto in time, place, and causal connection as to make

the killing part of the same criminal enterprise as the robbery. *Bassett v. Commonwealth*, 222 Va. 844, 855-56, 284 S.E.2d 844, 851-52 (1981), *cert. denied*, 456 U.S. 938 (1982); *Whitley v. Commonwealth*, 223 Va. 66, 73, 286 S.E.2d 162, 166, *cert. denied*, 459 U.S. 882 (1982).

Where the defendant challenges the sufficiency of the evidence, it is our duty under familiar principles "to look to that evidence which tends to support the verdict and to permit the verdict to stand unless plainly wrong. If there is evidence to sustain the verdict, this court should not overrule it and substitute its own judgment, even if its opinion might differ from that of the jury." *Snyder v. Commonwealth*, 202 Va. 1009, 1016, 121 S.E.2d 452, 457 (1961).

We need not decide whether the evidence was sufficient to establish robbery involving the victim's wallet, money, and shoes. We think the evidence clearly establishes robbery with respect to Alex Sztanko's motorcycle and helmet, and this requires affirmance of the jury's verdict on this aspect of the case. *See Turner v. United States*, 396 U.S. 398, 420-21 (1970) (when jury returns guilty verdict on indictment charging several acts in the conjunctive, the verdict stands if evidence is sufficient with respect to any one of the acts charged; status of case with respect to other allegations is irrelevant to validity of conviction).[3]

As noted *supra*, George told his cellmate, Roger Settle, that he had "grabbed [Alex Sztanko] and dragged him off of his bike." The record shows that Alex's motorcycle and helmet were found twenty to twenty-two feet from a trail through the woods. The ground between the trail and the location of the motorcycle was covered with thick foliage and briars which bore evidence that a "wheeled vehicle" had traversed the area. This area was about five-tenths of a mile from the point where Alex's body was discovered.

---

[3] George contends on appeal that the taking of Alex Sztanko's shoes could not constitute robbery because, he says, the evidence shows they were not removed from Alex's body until the day after the murder. George then argues that the trial court failed to instruct the jury properly on the subject of the shoes. The difficulty with George's argument is three-fold. First, the factual basis for the argument, *viz.*, that the shoes were not removed from Alex's body until the day after the murder, is questionable. Second, George did not offer an instruction embodying his theory with respect to the shoes. Rule 5:25. Third, under *Turner v. United States*, cited in the text, the status of the case with respect to the shoes is irrelevant to the validity of George's conviction; hence, his jury instruction argument is also irrelevant.

On the evening of Alex's disappearance, a group of young people, who had been drinking beer and swimming nearby, spotted the motorcycle and helmet as they were leaving the wooded area in a Jeep. Both items were located "up in the woods . . . off the main path," hidden from "common observation." One member of the group placed the helmet in the Jeep and another mounted the motorcycle, started it, and "took off with it."

The members of the group kept the motorcycle and helmet until Monday morning, when they learned from news reports that the vehicle was involved in Alex's murder. Three members of the group went to the police station and reported their involvement with the motorcycle. The police took possession of the motorcycle and helmet, which were identified as belonging to Alex Sztanko. Upon examining the spot where the group said they had found the motorcycle, one of the investigating officers observed an indentation consistent with a kick-stand "impacting the ground."

The Commonwealth argues that "[t]hese circumstances, combined with George's return to the general area of the crime the following day, permitted the jury to infer not only that George had taken the motorcycle and helmet from Alex by force, and removed them from the scene of the taking, but also that George had planned to return at a subsequent time and remove the motorcycle from the woods for his own purposes."

Countering, George argues that "there is absolutely no evidence whatsoever as to who put [the motorcycle] where it was found by [the people who had been swimming in the area]." So far as the evidence shows, George says, the victim himself might have placed it there. George maintains "it's pure speculation as to [when,] how, and why the bike was found twenty feet off the path."

It is here that the topographical map taken from George's person the morning after the murder becomes important. As noted *supra*, the map bore a hand-drawn "x" corresponding to the spot where Alex Sztanko's body was discovered and a hand-drawn "o" corresponding to the location where the motorcycle was found. These markings obviously were made after the murder had occurred and the motorcycle and helmet had been moved from the trail to the point where they were later found, showing George's guilty involvement in that movement.

Considering all the circumstances present in this case and the reasonable inferences to be drawn from the evidence, we think the jury was entitled to find that when George "grabbed [Alex

Sztanko] and dragged him off of his bike," he harbored the intention both to molest Alex sexually and to steal his motorcycle and helmet. Further, we are of opinion that the jury was justified in finding that the violence present in the "grabbing" continued as George took Alex into the woods, carried out his intention "to have sex with [him]," and killed him. Finally, we believe that the jury could conclude that the effects of the violence continued as George, once free from interference by Alex, removed the motorcycle and helmet from the trail and hid them, planning to return later and retrieve his bounty.

We conclude that Alex's murder was so closely related in time, place, and causal connection to the robbery that the killing became part of the same criminal enterprise as the robbery. Hence, Alex's murder was one occurring in the commission of robbery while armed with a deadly weapon within the meaning of Code § 18.2-31(4).

*Branch* v. *Commonwealth*, 225 Va. 91, 300 S.E.2d 758 (1983), cited by George, is inapposite. There, the defendant shot the victim during an argument at the defendant's home. After dragging the body into a bedroom, the defendant removed the victim's wallet from his clothing and burned the contents, which included no money. The defendant was convicted of second degree murder, robbery, and use of a firearm in the commission of a felony.

Noting that the question was "whether robbery was the motive for the killing," *id.* at 95, 300 S.E.2d at 760, we reversed the robbery conviction because the evidence showed that the defendant was "motivated by no other purpose than to cover up the crime he had committed," *id.*, and, hence, that "the violent killing and the unlawful taking were two separate acts, performed for entirely different reasons," *id.* Here, however, the evidence supports the finding that the murder and robbery of Alex Sztanko were parts of the same criminal enterprise and that George was motivated by the dual purpose of molesting Alex sexually and robbing him.

## C.   Amendment of Indictment for Abduction.

At the conclusion of the Commonwealth's case, George moved to strike the Commonwealth's evidence with respect to the charge of abduction with intent to defile. The sole ground of the motion was that the indictment stated that the offense was in violation of Code § 18.2-47, which is the general abduction statute prescribing a maximum punishment of ten years' imprisonment,

instead of Code § 18.2-48, which is the specific intent-to-defile abduction statute prescribing a maximum punishment of life imprisonment. Responding, the Commonwealth's Attorney opposed the motion and moved to amend the indictment to have it recite the correct Code section.

Noting that the indictment specifically charged George with abduction with "the intent to defile," the trial court denied George's motion to strike and granted the prosecutor's motion to amend. We find no error in this action. Rule 3A:6 provides that an error in the citation of the statute which defines the offense or prescribes the punishment shall not be ground for dismissal of an indictment or for reversal of a conviction "unless the court finds that the error or omission prejudiced the accused in preparing his defense."

We find no prejudice to George caused by the error in the citation of the statute, and all George says on the subject is that the amendment granted by the trial court "does prejudice the accused and should not be allowed." This is not sufficient to support a reversal of George's conviction.[4]

## D. Motion for Mistrial.

During closing argument at the guilt stage, the prosecutor asked for the maximum punishment for the three non-capital offenses being tried by the jury. He then commented on the loss to the community and to the victim's family occasioned by the death of Alex Sztanko. George moved for a mistrial on the ground that the argument was "getting into the meritorious characteristics of the victim . . . or the impact on the family." The trial court denied the motion, and George assigns the denial as error.

George's argument is based upon *Booth* v. *Maryland*, 482 U.S. 496 (1987), and *South Carolina* v. *Gathers*, 490 U.S. 805 (1989). *Booth* outlawed the use of a victim impact statement before a jury at the sentencing phase of a capital murder case. 482 U.S. at 509. *Gathers* extended *Booth* to include statements made by a prosecutor to a capital-sentencing jury regarding the personal qualities of the victim. However, in *Payne* v. *Tennessee*, ____ U.S. ____, 111

---

[4] George argues on appeal that "the evidence was insufficient as a matter of law to establish specific intent to defile." However, as noted in the text, the sole ground for George's motion to strike the Commonwealth's evidence was that the indictment cited the wrong Code section. He did not argue then, as he does now, that the evidence of intent to defile was insufficient. We will not notice the argument now. Rule 5:25.

S.Ct. 2597 (1991), the Supreme Court overruled both *Booth* and *Gathers*, stating: "We are now of the view that a State may properly conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant." ___ U.S. at ___, 111 S.Ct. at 2608.

■ George suggests, however, that while the argument involved in this case may have been proper at the sentencing phase of his trial, it was improper at the guilt stage. In responding to this suggestion, we note that there is no issue on appeal concerning the admissibility of impact evidence. Further, we point out that while the trial of the capital murder charge was still in the guilt phase when the argument in question was made, the trial had reached the guilt/sentencing stage with respect to the non-capital offenses being tried at the same time. Finally, we emphasize that the argument was confined to the issue of proper punishment for the non-capital offenses.

■ The narrow question to be decided, therefore, is whether it was improper for the prosecutor to argue for punishment on the non-capital offenses that took into account Alex Sztanko's human qualities and the impact of his death. Given the circumstances of this case, we think that the argument was not improper and, accordingly, that the trial court did not err in denying George's motion for mistrial.

## V.

### SENTENCING PHASE.

#### A. Adequacy of Discovery and Bill of Particulars.

George contends that the responses to his requests for information on the Commonwealth's basis for seeking the death penalty "were inadequate to give [him] notice and opportunity to defend against the death sentence." George's argument on this subject is so general as to leave one in doubt about the point he is trying to make. The Attorney General reads George's argument as combining a constitutional attack of vagueness against Virginia's "vileness" predicate with a factual complaint concerning the adequacy of the Commonwealth's responses in its answers to discovery and bill of particulars.

If George's argument does amount to a constitutional attack of vagueness against the "vileness" predicate, the argument is an-

swered by *M. Smith, supra,* 219 Va. at 478, 248 S.E.2d at 149. To the extent the argument also encompasses a factual complaint, one would think that if the Commonwealth's disclosures were insufficient, George would tell us, now that he knows all the Commonwealth's evidence, what the Commonwealth withheld from him and how he was prejudiced by the nondisclosure. In any event, we have examined the Commonwealth's responses to George's requests, and we consider the responses adequate.

### B. Jury Instructions.

Over George's objection, the trial court granted Instruction No. 1, requested by the Commonwealth, and refused Instruction A, requested by the defense. Instruction No. 1 told the jury that if it believed "from all the evidence" that the death penalty was not justified, it must fix the punishment of the defendant at life imprisonment. Instruction A would have emphasized the mitigating factors the jury should consider.

George argues that Instruction No. 1 did not permit the jury to consider all the evidence in determining mitigation while Instruction A did. We disagree with George. In *Gray, supra,* we considered a similar argument against an instruction containing the same language as Instruction No. 1. We held that the instruction "sufficiently and properly states the statutory framework" and that a defense instruction emphasizing mitigating factors was properly refused. 233 Va. at 350-51, 356 S.E.2d at 178; *see also LeVasseur,* 225 Va. at 594-95, 304 S.E.2d at 660-61.

## VI.

### SENTENCE REVIEW.

#### A. Passion and Prejudice.

Code § 17-110.1(C)(1) requires this Court to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor." George argues that, because the charge of capital murder committed in the course of robbery was consolidated with the charge of abduction with intent to defile, the jury heard evidence of "homosexual defilement" while the murder charge "involved an instantly fatal shot and the robbery was entirely circumstantial." Hence, George

concludes, his death sentence was the product of passion, prejudice, and arbitrariness.

■ We disagree with George. In the first place, the trial court's action in consolidating the cases is not the subject of any assignment of error, so we do not consider the question whether the consolidation was improper. Rule 5:25. Furthermore, considering all the evidence surrounding the criminal enterprise involved in this case, we find not even the slightest suggestion that the jury acted out of passion, prejudice, or arbitrariness.

The evidence fully supports the jury's finding of both "future dangerousness" and "vileness." Indeed, George does not question these findings. We have examined each claim of error George has made and have found no indication of passion or prejudice in any single instance. Nor do we find that the cumulative effect of the alleged errors has produced a sentence influenced by some untoward factor.

### B. Excessiveness and Disproportionality.

■ Code § 17-110.1(C)(2) requires that we consider and determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." George says that his sentence "is excessive and disproportionate to the penalty imposed in similar cases," but he does not tell us why the sentence is excessive and disproportionate. Nevertheless, we have examined the records of all capital murder cases reviewed by this Court in which the death penalty was based upon both "future dangerousness" and "vileness." Having considered those records, as well as those of cases in which life imprisonment was imposed, we conclude that George's sentence of death is not excessive or disproportionate to sentences generally imposed by other sentencing bodies in this jurisdiction for crimes of similar nature. Indeed, few equal or exceed in vileness the crime committed by George.

Cases in which the death sentence was based upon both "future dangerousness" and "vileness" are collected in *Spencer* v. *Commonwealth*, 238 Va. 295, 319-20, 384 S.E.2d 785, 800 (1989), *cert. denied*, 493 U.S. 1093 (1990) (*Spencer II*). In the meantime, we have decided several other cases where the death penalty was based upon both predicates: *Strickler* v. *Commonwealth*, 241 Va. 482, 404 S.E.2d 227 (1991); *Quesinberry* v. *Commonwealth*, 241 Va. 364, 402 S.E.2d 218 (1991); *Stockton* v. *Commonwealth*, 241

Va. 192, 402 S.E.2d 196 (1991); *Spencer* v. *Commonwealth*, 240 Va. 78, 393 S.E.2d 609, *cert. denied*, 498 U.S. ___, 111 S.Ct. 281 (1990) (*Spencer IV*); *Mu'Min* v. *Commonwealth*, 239 Va. 433, 389 S.E.2d 886 (1990), *aff'd*, 500 U.S. ___, 111 S.Ct. 1899 (1991); *Smith* v. *Commonwealth*, 239 Va. 243, 389 S.E.2d 871, *cert. denied*, 498 U.S. ___, 111 S.Ct. 221 (1990); *Spencer* v. *Commonwealth*, 238 Va. 563, 385 S.E.2d 850 (1989), *cert. denied*, 493 U.S. 1093 (1990) (*Spencer III*); *Watkins* v. Commonwealth, 238 Va. 341, 385 S.E.2d 50 (1989), *cert. denied*, 494 U.S. 1074 (1990).

## VII.

We find no error in any of the issues raised by George and no reason to disturb his death sentence. Accordingly, we will affirm each of the five judgments involved in this appeal.

*Affirmed.*