Tuesday        8th

December, 1998.


William Cage Stevenson,                                    Appellant,

 against        Record No. 0920-97-2
                Circuit Court No. 11,534

Commonwealth of Virginia,                                  Appellee.


Upon a Rehearing En Banc

Before Chief Judge Fitzpatrick, Judges Benton, Coleman,
Willis, Elder, Bray, Annunziata, Overton, Bumgardner and Lemons

Thomas C. Hill (Max Reynolds; Kimberly A.
Jackson; Shaw, Pittman, Potts & Trowbridge,
on briefs), for appellant.

Daniel J. Munroe, Assistant Attorney General
(Mark L. Earley, Attorney General, on
brief), for appellee.

A divided panel of this Court affirmed the judgment of the trial court.  See Stevenson v. Commonwealth, 27 Va. App. 453, 499 S.E.2d 580 (1998).  We stayed the mandate of that decision and granted a rehearing en banc.

Upon rehearing en banc, the judgment of the trial court is affirmed without opinion by an equally divided Court.  Chief Judge Fitzpatrick, Judges Benton, Elder, Bray and Annunziata voted to reverse the judgment of the trial court.  Judges Coleman, Willis, Overton, Bumgardner and Lemons voted to affirm said judgment.

This order shall be published and certified to the trial court.

A Copy,

Teste:

Cynthia L. McCoy, Clerk

By:

Deputy Clerk

                                        Tuesday        21st

        July, 1998.


William Cage Stevenson,                                    Appellant,

  against      Record No. 0920-97-2
              Circuit Court No. 11,534

Commonwealth of Virginia,                                  Appellee.


                Upon a Petition for Rehearing En Banc

                    Before the Full Court


        On June 19, 1998 came the appellant, by counsel, and filed a
petition praying that the Court set aside the judgment rendered herein
on June 2, 1998, and grant a rehearing en banc thereof.

        On consideration whereof, the petition for rehearing en banc
is granted, the mandate entered herein on June 2, 1998 is stayed
pending the decision of the Court en banc, and the appeal is
reinstated on the docket of this Court.

        The parties shall file briefs in compliance with Rule 5A:35.
 It is further ordered that the appellant shall file with the clerk of
this Court ten additional copies of the appendix previously filed in
this case.

                    A Copy,

                        Teste:

                                Cynthia L. McCoy, Clerk

                    By:

                    Deputy Clerk


                            - 3 -

COURT OF APPEALS OF VIRGINIA


Present:  Judges Benton, Coleman and Senior Judge Cole
Argued at Richmond, Virginia


WILLIAM CAGE STEVENSON
                                        OPINION BY
v.    Record No. 0920-97-2      JUDGE SAM W. COLEMAN III
                                        JUNE 2, 1998
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
                   Paul M. Peatross, Jr., Judge

        Thomas C. Hill (Max M. Reynolds; Shaw,
        Pittman, Potts & Trowbridge, on briefs), for
        appellant.

        Daniel J. Munroe, Assistant Attorney General
        (Richard Cullen, Attorney General, on brief),
        for appellee.


     Dr. William Cage Stevenson was convicted by a jury for

"forg[ing] a cardiac stress test writing, to the prejudice of

Trigon Blue Cross/Blue Shield" (Trigon), in violation of Code

§ 18.2-172.  Conceding he altered the date the stress test was

given, Stevenson contends the evidence is insufficient to prove

that his conduct operated "to the prejudice" of Trigon.  We hold

that the evidence is sufficient to prove that Stevenson's

alteration of the date of the stress test was prejudicial to

Trigon.  Accordingly, we affirm the conviction.

                         BACKGROUND

     Viewed in the light most favorable to the Commonwealth, see

Higginbotham v. Commonwealth, 216 Va. 349, 352, 218 S.E.2d 534,

537 (1975), the evidence proved that in December 1995, Stevenson,

a physician at the University of Virginia Medical Center, was

treating Leonard Kraditor, a patient in need of a liver transplant.  As a prerequisite to Kraditor being placed on the hospital's waiting list for a donated liver, hospital administrators required "pre-authorization" from Kraditor's medical insurance carrier, Trigon Blue Cross/Blue Shield.

Dr. Richardson Grinnan, Senior Vice President and Chief Medical Officer of Trigon, testified that "[p]re-authorization is a service which [Trigon makes] available to [health care] providers to ensure benefit coverage and to avoid adverse medical necessity determinations after the fact."  To obtain pre-authorization for transplant surgery, Trigon requires providers to submit a letter of medical necessity that addresses the severity of a patient's medical condition and the patient's ability to survive the stress of surgery.  Generally, before placing a patient's name on the transplant list, the hospital's transplant financial coordinator submits to the patient's insurer a pre-authorization request, together with a letter of medical necessity, and awaits its approval.

After Dr. Stevenson discussed Kraditor's condition with the hospital's financial coordinator and conveyed his belief that liver donations would increase during the holiday season, Dr. Stevenson convinced the financial coordinator to place Kraditor on the transplant list before receiving Trigon's pre-authorization pursuant to the hospital's emergency protocol.  The financial coordinator did so contingent upon Stevenson

providing a letter of medical necessity to Trigon as soon as possible after the new year.  On January 18, 1996, Stevenson sent a letter to Trigon stating:

> We have evaluated [Kraditor's] cardiac, renal and pulmonary function and repeated tests to rule out other causes.  We have reviewed his case in our candidate selection meeting and feel he is a good candidate for re-transplantation.  We are now seeking financial approval from you to proceed with . . . Kraditor's treatment.

Without knowing whether Trigon had pre-authorized the transplant, Dr. Stevenson implanted a donated liver in Kraditor on January 21, 1996.  Kraditor suffered no cardiovascular complications from the surgery.

Three days after the transplant, Trigon tentatively denied "pre-authorization" for the surgery and requested additional information from the hospital, including the results of Kraditor's cardiac evaluation mentioned in Stevenson's letter. The financial coordinator was unable to find the cardiac stress test results in Kraditor's file and asked Stevenson to address Trigon's query.  By this time, Kraditor was experiencing significant health deterioration, the liver was failing and he would require another liver transplant.  The hospital informed Stevenson that Kraditor could not undergo a second liver transplant until it received Trigon's pre-authorization for the first transplant.

Stevenson obtained a copy of a stress test performed two years earlier, in April 1994, on Kraditor at another hospital.

Using a computer scanner, Stevenson altered the date on the stress test to make it appear that the test had been given just a few months before he performed Kraditor's transplant surgery. Stevenson delivered the altered stress test to the financial coordinator, who forwarded it to Trigon on February 6, 1996. Relying in part on the date-altered stress test, Trigon authorized the transplant surgery on February 12, 1996, three weeks after Kraditor's surgery. Marietta Boyce, Trigon's Manager of Medical Policy, testified that the pre-authorization would not have been given had the hospital failed to provide the stress test or similar data. The hospital later discovered that Stevenson had altered the date on the stress test and elected not to submit a claim for reimbursement to Trigon.

Stevenson was indicted on charges of forging the test to the prejudice of Trigon and uttering the test, knowing it was forged. A jury convicted him of forgery under Code § 18.2-172 and acquitted him of the uttering charge.[1]

### ANALYSIS

Code § 18.2-172 provides that "[i]f any person forge any writing . . . to the prejudice of another's right . . . , [that person] shall be guilty of a Class 5 felony."[2]  The General

---

[1]The jury recommended a minimum penalty of a one dollar fine against Dr. Stevenson. As a result of the conviction, Dr. Stevenson's license to practice medicine was automatically suspended. See Code § 54.1-2917. After an evidentiary hearing, the Virginia Board of Medicine reinstated his license.

[2]Code § 18.2-172 criminalizes the forgery and uttering of all writings not covered by the statutory provisions proscribing

Assembly intended to codify the English common law of forgery by enacting Code § 18.2-172. See Campbell v. Commonwealth, 246 Va. 174, 182-83, 431 S.E.2d 648, 653 (1993). At common law, the crime of forgery "is defined as 'the false making or materially altering with intent to defraud, of any writing which, if genuine, might apparently be of legal efficacy, or the foundation of legal liability.'" Fitzgerald v. Commonwealth, 227 Va. 171, 173, 313 S.E.2d 394, 395 (1984) (citation omitted); see Gordon v. Commonwealth, 100 Va. 825, 829, 41 S.E. 746, 748 (1902). A document or instrument is one of legal efficacy "where by any possibility it may operate to the injury of another." Gordon, 100 Va. at 829, 41 S.E. at 748 (emphasis added). Thus, to support a conviction under the modern forgery statute, the Commonwealth must prove that the forged or altered document operated to the actual or potential prejudice of another. See Muhammad v. Commonwealth, 13 Va. App. 194, 199, 409 S.E.2d 818, 821 (1991) ("bare possibility" of prejudice is sufficient under Code § 18.2-172).

In addition, Code § 18.2-172 does not require that the forged or altered document operate to the actual prejudice of one who does or could rely on the genuineness of the document itself. See, e.g., Hanbury v. Commonwealth, 203 Va. 182, 187, 122 S.E.2d 911, 915 (1961) (counterfeit city tax stamp affixed to cigarette

forgery of public documents, seals, and bank notes. Cf. Code § 18.2-168 (forgery of "public records"); Code § 18.2-169 (forgery of "seal"); Code § 18.2-170 (forgery of "coin or bank notes").

- 8 -

packages by cigarette vender operated to prejudice of city).  To prove a forgery under the statute, the Commonwealth was required to prove only that the forged document had the potential to operate "to the prejudice of <u>another</u>."  Code § 18.2-172 (emphasis added).  Here, the Commonwealth elected to charge that Stevenson's conduct operated "to the prejudice of Trigon."

Stevenson concedes he altered the date of the stress test.  The sole issue on appeal is whether the evidence is sufficient as a matter of law to prove that the alteration of the date of the stress test operated to the actual or potential prejudice of Trigon.[3]

When the sufficiency of the evidence is challenged on appeal, we must determine whether the evidence, viewed in the light most favorable to the Commonwealth, and the reasonable inferences fairly deducible from that evidence, prove every essential element of the offense beyond a reasonable doubt.  <u>See</u> <u>Moore v. Commonwealth</u>, 254 Va. 184, 186, 491 S.E.2d 739, 740 (1997); <u>Derr v. Commonwealth</u>, 242 Va. 413, 424, 410 S.E.2d 662, 668 (1991).  We will not disturb a jury's verdict unless it is plainly wrong or without evidence to support it.  <u>See</u> <u>George v. Commonwealth</u>, 242 Va. 264, 278, 411 S.E.2d 12, 20 (1991).  We

---

[3]Stevenson does not address, nor do we consider in this appeal, whether the stress test was an <u>instrument</u> that may be the subject of a criminal forgery.  <u>See</u> <u>generally</u> 36 Am. Jur. 2d <u>Forgery</u> § 27 (1968) ("crime of forgery . . . covers nearly every class of instruments known to the law as effecting private or public rights"); 37 C.J.S. <u>Forgery</u> §§ 19, 31 (1997).

find the evidence sufficient to prove that Trigon was prejudiced and could have been further prejudiced by Stevenson's alteration of the stress test.

The evidence established that pre-authorization is an integral part of the framework by which Trigon ensures coverage for medical treatment and approves payment of claims under a patient's insurance contract.  Although claims may be paid without pre-authorization, the evidence proved that Trigon routinely pays claims because they have been pre-authorized.  At trial, during her direct examination, Boyce explained the close nexus between Trigon's pre-authorization and its payment of insurance benefits:

> [BOYCE]:  Once the claim was submitted for solid organ transplants, once you approve them to list, no one knows if the recipient is going to receive an organ or how long they'll have to wait for an organ to become available.  So, what [Trigon's pre-authorization] shows is that it's been pre-authorized to do, but claim payment would not start until the transplant center submitted the claim for the transplant itself.
>
> [COMMONWEALTH'S ATTORNEY]:  Was there anything left to be done by Trigon as far as approval for payment?
>
> [BOYCE]:  No.
>
> [COMMONWEALTH'S ATTORNEY]:  So, [the pre-authorization] was the end of it as far as the approval process for Trigon?
>
> [BOYCE]:  For the transplantation itself.

Thus, according to Boyce, "Trigon [may] approve medical services

. . . before the services are rendered or after the services are rendered."  Although other evidence shows that a final benefits determination is ultimately made when the claim is submitted for approval, pre-authorization is a determination that benefits will be paid for the services for which preliminary approval is granted.  Thus, Dr. Stevenson fraudulently attempted to obtain pre-authorization for the transplant, albeit after the fact, to the same end he would have been pursuing had he done so before the operation -- that is, to obtain Trigon's determination that it would reimburse the providers for the costs of the transplant.  In this vein, the evidence proved that the alteration of the stress test prejudiced Trigon.

We disagree with Stevenson's contention that Trigon's pre-authorization was rendered "moot" by the fact that Kraditor had the operation and survived without cardiac complications before Stevenson altered the stress test.  Admittedly, Dr. Larry Colley, a Trigon official, testified that "Trigon would have approved coverage for [the] transplant operation" notwithstanding the pre-authorization because Kraditor had survived the operation without cardiac complication.  And, as Dr. Stevenson repeatedly notes, Dr. Grinnan testified that "the patient underwent successful surgical intervention without cardiac complication making the test result a noncontributory factor relative to final benefits determination."  However, the fact remains that Trigon predicated its approval of the liver transplant on the medical

necessity letter submitted by Stevenson that eventually included the altered cardiac stress test. The dispositive factor is that the pre-authorization procedure prejudiced Trigon because when Stevenson forged the stress test data it could have prejudiced Trigon, regardless of whether as the facts developed other factors may have ultimately controlled payment. Trigon "pre-approved" the transplant based upon the letter of medical necessity and the forged stress test. Indeed, Dr. Grinnan testified that Trigon only "review[s] cases after the fact <u>if they haven't been pre-approved</u>." (Emphasis added). Therefore, in making a final benefits determination, Trigon would not have had to consider whether Kraditor survived without complication because it had pre-approved the transplant and, as the testimony from Boyce and Dr. Grinnan confirms, "there [was nothing] left to be done as far as approval for payment."

CONCLUSION

We find the evidence to be sufficient as a matter of law to prove that Stevenson altered the cardiac stress test "to the prejudice of [Trigon's] right," in violation of Code § 18.2-172. We do not question Dr. Stevenson's motives or that he forged the stress test in order to provide the medical care that his patient critically needed while avoiding the procedural requirements of a managed health care plan. Nevertheless, his forgery of the cardiac stress test violated Code § 18.2-172. Accordingly, we affirm the conviction.

<u>Affirmed.</u>

Benton, J., dissenting.

Dr. William C. Stevenson concedes he altered the date of the stress test. The sole issue on appeal is whether the evidence is sufficient to prove beyond a reasonable doubt that the alteration of the date of the stress test operated "to the prejudice of [Trigon Blue Cross/Blue Shield's] right." I believe the evidence is insufficient because the Commonwealth did not meet its "burden . . . to prove every essential element of the offense beyond a reasonable doubt." Moore v. Commonwealth, 254 Va. 184, 186, 491 S.E.2d 739, 740 (1997). Viewed in the light most favorable to the Commonwealth, the evidence failed to prove that Stevenson's alteration of the date of the stress test, under the facts of this case, could have prejudiced Trigon.

The evidence proved that in the mid-1970s Leonard Kraditor underwent a coronary bypass operation because of coronary artery disease. Kraditor had his first liver transplant operation in 1989 and survived the surgery without cardiac complications. In December 1995, Stevenson was treating Kraditor and determined that Kraditor needed another liver transplant. Stevenson informed Trigon of the following:

> We have evaluated [Kraditor's] cardiac, renal and pulmonary function and repeated tests to rule out other causes. We have reviewed his case in our candidate selection meeting and feel he is a good candidate for re-transplantation. We are now seeking financial approval from you to proceed with . . . Kraditor's treatment.

Trigon tentatively denied pre-authorization for Kraditor's transplant surgery and requested additional information concerning Kraditor's cardiac condition.

Stevenson altered the date of Kraditor's earlier stress test. However, when Stevenson altered the date, Kraditor had already undergone the liver transplant surgery and had survived the surgery without cardiovascular complications. Although Trigon relied upon the stress test in granting pre-authorization for the transplant surgery after the surgery had been performed, the evidence failed to prove that the pre-authorization could have affected either Trigon's final benefits determination or Trigon's obligations under its insurance contract. Trigon's senior officials testified that Trigon was contractually obligated to pay for the operation once Kraditor survived the surgery without cardiac complications, notwithstanding either the alteration of the date of the stress test or Trigon's pre-authorization for the treatment already given.

The evidence proved, at most, that pre-authorization is a "service" that gives health care providers a "preliminary indication" whether the treatment will be covered by Trigon. Indeed, Dr. Richardson Grinnan, Trigon's Senior Vice President and Chief Medical Officer, testified as follows:

> We provide the pre-authorization process
> as a service to physicians and subscribers to
> prevent after-the-fact medical necessity
> denials. In this particular incidence, we
> didn't receive the information, but given the
> fact--and we would have required that he have
> that information submitted to us in advance

to give them some preliminary indication of whether or not we would have covered the surgery, but not receiving the information in advance, but with him surviving the operation, it would not have had an adverse determination on whether or not we would have paid that bill.

Marietta Boyce, a registered nurse employed by Trigon, testified that Kraditor's insurance policy did not require Kraditor or his physicians to seek pre-authorization from Trigon as a condition of coverage.

The Commonwealth failed to prove that, after Kraditor survived the surgery without cardiac complications, the stress test itself could have had any bearing on Trigon's final benefits determination for the transplant surgery. The evidence undisputedly proved that a final benefits determination had to be made by Trigon when the claim was submitted and before Trigon paid for the surgery. Dr. Grinnan testified that because Kraditor "underwent successful surgical intervention without cardiac complications . . . [,] the test result [was] a non-contributory factor relative to final benefits determination." Consistent with that testimony, Dr. Lawrence Colley, who supervises Boyce in the department responsible for Trigon's coverage policy and reimbursement rates, testified as follows:

Q. . . . You indicated that had you known that Mr. Kraditor had undergone the liver transplant operation and that he did not have any cardiac event either during or after the operation and that, in fact, he died I think on February 2nd, I believe, because his body rejected the transplanted liver, Trigon would

have approved coverage for that transplant operation, wouldn't it?

A.   I stated that, yes.


Although the majority states that Boyce, the registered nurse who is supervised by Dr. Colley, explained a nexus between Trigon's pre-authorization and its payment of benefits, the excerpt from Boyce's testimony in the majority opinion clearly proves that her testimony was limited to explaining that she had pre-authorized only "[f]or the transplant itself" and not the payment of the claim.  Any doubt about the limited nature of her testimony is dispelled by her response to the following questions:

Q.   All right.  And . . . do you know Dr. Colley?

A.   That's my boss.

Q.   Okay.  And do you know Dr. Grinnan at Trigon?

A.   That's my boss's boss, yes.

Q.   Okay.  Dr. Grinnan is above Dr. Colley and Dr. Colley is above you.

A.   Correct.

Q.   You know now, don't you, that Dr. Grinnan and Dr. Colley will say that if Trigon knew that Mr. Kraditor had successfully undergone the liver transplant operation on January 29th, I think, without any incidence of a cardiac arrest or cardiac event, that it wouldn't have made any difference to them whether or not Trigon had a cardiac stress test?  Don't you know that Dr. Colley and Dr. Grinnan have taken that position?

A.   Yes.

In addition, the majority's assertion that Trigon would not have made a final benefits determination because it had provided a pre-authorization service is based upon a misunderstanding of Dr. Grinnan's testimony. The full context of Dr. Grinnan's testimony in that regard is as follows:

> Q. Does Trigon Blue Cross/Blue Shield have different procedures with respect to the pre-approval and post-approval of medical care coverage?
>
> A. Not everything is pre-approved. Pre-approval is the process that we make available as a service to doctors to avoid problems. We review cases after the fact if they haven't been pre-approved and we make determinations based on information that's available.

That testimony does not imply that pre-authorized procedures are not reviewed for final benefits determinations when claims are submitted. Dr. Grinnan merely stated that in those cases where no request for pre-approval has been made, a benefits determination will be made when the claim is submitted.

Once the surgery had been performed on Kraditor, the pending application for pre-authorization was rendered moot. Dr. Grinnan testified that the stress test, required by Trigon to measure pre-operative risk, was then a "non-contributory factor relative to final benefits determination." At that point, the date-altered stress test had no potential to prejudice Trigon's rights because "it does not fix, nor could it operate, any pecuniary liability upon [Trigon]." Terry v. Commonwealth, 87

- 18 -

Va. 672, 674, 13 S.E. 104, 104 (1891).

Considered in the light most favorable to the Commonwealth, the evidence proved that Kraditor survived the surgery without cardiac complications and later died because of liver and renal failures, causes unrelated to cardiac complications.  The evidence also proved that Stevenson's alteration of the date of the stress test, the act the Commonwealth sought to prove to be a forgery, was "a non-contributing factor relative to [Trigon's] final benefits determination."  Thus, the evidence failed to prove beyond a reasonable doubt that Stevenson forged the stress test to the potential prejudice of Trigon.  Accordingly, I would reverse the conviction and dismiss the indictment.