COURT OF APPEALS OF VIRGINIA

Present: Judges Elder, Lemons and Senior Judge Cole
Argued at Richmond, Virginia

KELLEY ANN TIBBS

OPINION BY

v.    Record No. 1717-98-2            JUDGE MARVIN F. COLE
                                      MARCH 7, 2000

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
William R. Shelton, Judge

John F. McGarvey for appellant.

Robert H. Anderson, III, Assistant Attorney
General (Mark L. Earley, Attorney General, on
brief), for appellee.


Appellant, Kelley Ann Tibbs, was convicted by a jury of robbery, abduction and capital murder. The capital murder conviction was based on a finding of a murder committed in the commission of robbery. See Code § 18.2-31(4).

Appellant was sentenced to ten years for the robbery conviction and life imprisonment for the capital murder conviction. She was also sentenced to ten years for the abduction, but this conviction has not been appealed.

At the writ stage of this proceeding, appellant contended: (1) the trial court erred by entering final judgment on the robbery verdict when the verdict was based on evidence that was insufficient as a matter of law; and (2) the trial court erred by entering final judgment on the capital murder verdict when

the verdict was based on evidence that was insufficient as a matter of law.

We denied the first assignment of error but granted the second.  Therefore, the sole question before us is whether the evidence is sufficient to support the capital murder conviction.

FACTS

"On appeal, 'we review the evidence in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom.'"  Archer v. Commonwealth, 26 Va. App. 1, 11, 492 S.E.2d 826, 831 (1997) (citation omitted).  So viewed, the evidence proved that, on July 26, 1997, appellant, Dana Vaughn and the victim, Stacy Hanna, lived at 210 South Belmont Avenue in the City of Richmond.  Tracy Bitner previously lived at the Belmont Avenue house.  Domica Winckler lived around the corner from Belmont Avenue.  Stephanie Cull lived in Chester.  They were all friends.

Appellant had a homosexual relationship with Bitner. Appellant and Bitner ended their relationship shortly before Hanna moved into the Belmont Avenue house.  After Hanna moved in, appellant and Hanna became romantically involved.

Around 9:00 p.m. on Saturday, July 26, 1997, appellant, Vaughn, Cull, Bitner, Winckler, Hanna, a female named Sandy and a female named Leslie attended a party.  Sandy was Bitner's new friend.  At the party, Hanna made comments to appellant in an

attempt to dissuade appellant from reconciling with Bitner and to further Hanna's romantic involvement with appellant; Hanna told appellant that Bitner and Sandy were a happy couple, that Bitner no longer wanted a romantic relationship with appellant, and that appellant needed to be involved with Hanna.

Later, the group returned to Belmont Avenue. Appellant had a private discussion with Sandy, while Bitner, Hanna, Vaughn and others went into another room. Afterwards, Hanna approached appellant and said that Bitner told her, Hanna, that Bitner no longer wanted a relationship with appellant and that Bitner wanted Hanna to relate that information to appellant.

Appellant, Cull, Bitner and Winckler then left the Belmont Avenue house. While gone, appellant learned that Bitner did not make the statements that Hanna related to appellant. Appellant became angry with Hanna and expressed her desire to "beat her ass." According to appellant, "everybody else [in the car at that time] was like yeah we're gonna beat her ass." The original plan was to "take her to Byrd Park and . . . rough her up and leave her there and let her walk home."

The four women then returned to the Belmont Avenue house. Appellant, Winckler and Cull invited Vaughn and Hanna to ride with them and Bitner to Marsh Field in Chesterfield County to "hang out." Cull drove. Upon arriving at Marsh Field, appellant, Cull, Winckler and Bitner exited the car. Hanna remained in the car with Vaughn, who was ill. A short time

later, appellant entered the car and told Hanna that she would stay with Vaughn.  After Hanna exited the car, appellant told Vaughn "that they were going to kick [Hanna's] ass" because she lied to appellant about Bitner.  Appellant then exited the car and joined the group, leaving Vaughn alone in the car.

While in the car at Marsh Field, Vaughn could not see the group, but she "heard them start beating" Hanna.  Cull returned to the car and turned on the headlights.  Vaughn then saw Hanna "covered in blood."  Vaughn testified that she saw Bitner "push [Hanna] down and Domica [Winckler] picked up a cinder block . . . and threw it on her."  Eventually, all of them returned to the car while Hanna lay on the ground.

Vaughn testified that, while leaving Marsh Field, "there was a conversation."  Appellant "was saying that we needed to take her to a hospital or something or a phone at least." Bitner "suggested that we cut out her tongue so she couldn't talk."  Winckler "said that we needed to cut off her fingers so she couldn't write."  They "went down the road a ways," then returned to Hanna's location and placed Hanna in the trunk of the car.

En route to another location, Hanna "started beating on the trunk," so Cull stopped the car and Winckler got out and opened the trunk.  Hanna asked to be taken to a telephone "so she could call her mother and tell her that she loved her," but Winckler "told her no and shut the trunk."

Cull then drove to an isolated location on Nash Road and stopped the car. Cull, Bitner, Winckler and appellant got out of the car and stood around the trunk. Vaughn testified that she "heard Domica [Winckler] tell Stacy [Hanna] to give her her rings and her watch." Hanna "said that she could have them, all but one." Winckler "said give me all of them." Hanna was then removed from the trunk. At that point, Cull, Winckler, Bitner, and appellant took Hanna under the fence and down the road. The four women proceeded down a deserted path until Vaughn was unable to see them. At some point, Cull returned to the car. Vaughn "heard a cry and then [she] heard another cry and then [she] heard the cry get muffled, something, and that was it." Winckler and Bitner returned to the car twenty minutes later, followed by appellant. All three women were muddy. Vaughn testified that Bitner and Winckler "were kind of bragging about what they had done."

> [Winckler] said that she had stabbed her
> with a bladeless knife in her chest. And
> Tracy [Bitner] was bragging how she had
> stabbed her a bunch of times in the heart
> saying, "Give me your heart, Bitch, why
> don't you die." And she had slit her throat
> and stuffed mud in her mouth to get her to
> stop screaming.

Bitner testified that appellant, Winckler and Cull initiated the attack on Hanna at Marsh Field when they began to kick and hit Hanna. Bitner saw appellant and Winckler with box cutter razor knives. Bitner took one of the box cutter razor

- 5 -

knives and cut Hanna on the back of her shoulder. Appellant and Winckler continued to kick and punch Hanna. After Winckler hit Hanna with a cinder block, the attackers "got in the car" to leave. They "went down the road a little bit and it was brought up that [Hanna] was going to tell." Cull then "turned around and we went back" to get Hanna. Hanna "had crawled" to a different spot, and appellant and Winckler picked her up and placed her in the trunk. When asked if they planned on taking Hanna to a hospital, Bitner stated, "I don't think a hospital was involved." Cull stopped her car twice after leaving Marsh Field. The first time, Cull "got out and kicked" Hanna; the second time, all four participants exited and stood around the open trunk during the robbery of Hanna. Winckler ordered Hanna to give her Hanna's watch, eventually taking it and spitting on Hanna. Cull then "cut [Hanna] on the leg" with the box cutter razor knife.

According to Bitner, after they arrived at Nash Road, appellant, Cull, Winckler and she took Hanna down a "dirt road." The four women had three box cutter razor knives. "Thirty steps" down the dirt road, Cull cut Hanna on her back with the razor. Cull then gave the razor to Bitner and returned to the waiting car. Appellant and Winckler had the other razors. Initially, Hanna walked "on her own and then she fell." After she fell, the group picked her up and carried her. The group stopped near a mud puddle. Appellant, Winckler and Bitner

removed Hanna's clothes that allegedly belonged to appellant. Winckler then pushed Hanna to the ground and "in the mud." According to Bitner, Winckler "stabbed [Hanna] in the chest a couple of times with the box cutter," and appellant "punched her and stuff." Bitner cut Hanna's throat with the box cutter razor knife, after which appellant "came around and choked her." Bitner and Winckler left the scene first, while appellant "stayed back" for "two or three minutes." When Bitner and Winckler left, Hanna was still alive and screaming. Upon arriving at Cull's car, appellant "said she stabbed [Hanna] with a stick." Bitner estimated that "an hour or two" passed from the time of the first attack at Marsh Field until the group left the Nash Road location.

Appellant told the police that, after they removed Hanna from the trunk at Nash Road, they ordered her to take off her shirt and shorts. Appellant, Bitner and Winckler took Hanna down a dirt path, made her fall face first in muddy water, and kicked her numerous times. Appellant recalled Bitner saying she tried to break Hanna's neck, but it would not break, so Bitner said she cut it. Appellant told Detective Mormando that Winckler "took off [Hanna's] watch" and was wearing it when the police arrived at her home. In her statement, appellant said, "we were all kind of feeding off each other because when Mica [Winckler] hit her I was like yeah you know. And I kicked her.

And I hit her twice. And then Tracy [Bitner] was like yeah you know. We're just gonna kick her around."

Detective McQuire recovered two of Hanna's rings at Marsh Field. Detective Mormando "took [Hanna's watch] off of Domica Winckler's wrist at Richmond [P]olice headquarters when she was interviewed there."

Dr. Marcella Fierro, Chief Medical Examiner, performed the autopsy on Hanna. Dr. Fierro "counted a minimum of 65" cuts and stab wounds inflicted upon Hanna, including a five and one-half inch long, one-half inch deep cut on her neck and another "cut above that [one] into the trachea, into the airway." In addition, Dr. Fierro saw numerous "blunt force injuries" to Hanna's head and face, including "a fracture of the bridge of her nose, big, black eyes, [and] an abrasion of her left cheek." "On the right side of [Hanna's] face she had a big [5-inch by 3-inch] contusion or big bruise underneath the scalp . . . . In front of that . . . was a three-quarters inch contusion or bruise." Dr. Fierro found "[a]nother one on the left parietal region, and then three in a row . . . behind the left ear. There was one that was associated with a big bruise that you could see on the outside." In addition, Dr. Fierro found numerous abrasions to Hanna's feet, torso, knee, elbow, hip and shoulder. Dr. Fierro also described linear cuts on Hanna's hands indicating defensive injuries. Internally, Hanna's "organs were very pale," indicating "she lost a great deal of

- 8 -

blood." Hanna's lungs "were very large and they were very

heavy. And there was sand and water in the airways, and there

was sand and water in her stomach indicating she swallowed

muddy, sandy water." Dr. Fierro opined that Hanna died of

"exsanguination [excessive loss of blood] due to the cutting

wounds and dragging" and of drowning. According to Dr. Fierro,

Hanna was alive when her face was in the water. When Dr. Fierro

received the body, Hanna was wearing underwear and an ankle

bracelet, but she found "no other personal effects."

                              DISCUSSION

At the time of this offense, Code § 18.2-31 provided, in

pertinent part, as follows:

> The following offenses shall constitute
> capital murder, punishable as a Class 1
> felony:
>
>   *       *       *       *       *       *       *
>
> 4.  The willful, deliberate and premeditated
> killing of any person in the commission of
> robbery or attempted robbery.

"Code § 18.2-31, defining capital murder, was first enacted

by the General Assembly in 1975 as part of a statutory scheme

enacted to eliminate the 'unbridled choice between the death

penalty and a lesser sentence' prohibited by Furman v. Georgia,

408 U.S. 238 (1972)." Fitzgerald v. Commonwealth, 223 Va. 615,

635, 292 S.E.2d 798, 810 (1982).

It is obvious from the statute that to convict of capital

murder the Commonwealth must prove that the defendant committed

- 9 -

two offenses:  (1) Willful, deliberate and premeditated murder;[1] and (2) Robbery or attempted robbery.

"Robbery in Virginia has been repeatedly defined as a common law crime against the person . . . .  '"Robbery at common law is defined as the taking with the intent to steal, of the personal property of another, from his person or in his presence, against his will, by violence or intimidation."'" Crawford v. Commonwealth, 217 Va. 595, 597, 231 S.E.2d 309, 310 (1977) (citations omitted); see also Clay v. Commonwealth, 30 Va. App. 254, 258, 516 S.E.2d 684, 686 (1999) (en banc).

The Commonwealth calls our attention to the limited nature of this appeal and our ruling at the writ panel stage, wherein we held that the evidence was sufficient and adequately proved that Tibbs "acted in concert with the other women to take the victim's rings and watch" and thus was guilty of robbery.  We are bound by this decision in this appeal.  See Commonwealth v. Burns, 240 Va. 171, 174, 395 S.E.2d 456, 457 (1990).

In addition to proving the first degree murder and the robbery, appellant contends the Commonwealth must also prove by a preponderance of the evidence that the robbery was a motivating factor for the killing.  She asserts that the murder of Hanna was spawned by a "lover's quarrel" and that the robbery of Hanna was purely incidental and in no way causally related or

---

[1] Appellant does not challenge the sufficiency of the evidence to prove this prong of the capital murder offense.

connected to the murder. She contends that in order to be guilty of capital murder in the commission of a robbery, one must intend to commit robbery before or at the same time he or she intended to commit the killing. Appellant asserts that, under the facts of this case, she did not intend to kill Hanna until after the completion of the robbery and that the murder was committed with no regard to the robbery. Therefore, argues appellant, because the intent to kill did not occur before or concomitant with the robbery, the capital murder conviction must be reversed.

In support of her argument, appellant cites Branch v. Commonwealth, 225 Va. 91, 300 S.E.2d 758 (1983), Bunch v. Commonwealth, 225 Va. 423, 304 S.E.2d 271, cert. denied, 464 U.S. 977 (1983), and Edmonds v. Commonwealth, 229 Va. 303, 329 S.E.2d 807, cert. denied, 474 U.S. 975 (1985).

In Branch, witnesses saw Branch burn the contents of the victim's wallet fifteen to twenty minutes after the fatal shooting. Branch and a friend drove the victim's corpse to another location, where they left it. See 225 Va. at 93, 300 S.E.2d at 759. Branch attacked the robbery indictment, arguing that "the evidence 'was insufficient . . . to establish specific intent to steal the wallet contemporaneous with the shooting.'" Id. at 94, 300 S.E.2d at 759. Branch asserted that "'[t]he clear motive of removing the wallet and identification cards was to thwart police efforts in identification of the corpse' -- an

- 11 -

intention not formulated until well after all violence against the victim had been consummated and [the victim] was dead."  Id. The Supreme Court stated:

> Here, as in Whitley[v. Commonwealth, 223 Va. 66, 286 S.E.2d 162 (1982),] and Wm. Patterson[v. Commonwealth, 222 Va. 653, 283 S.E.2d 212 (1981)], the question is whether robbery was the motive for the killing. Branch's conduct, both before and after the killing, negates any inference that he had conceived an intent to rob at the time he shot his victim.  Up to that point, Branch had actually offered [the victim] money in an effort to resolve an argument and "to get [the victim] out of my house."  The effort failed, the argument continued, and the killing occurred.  Branch's conduct thereafter shows that he was motivated by no other purpose than to cover up the crime he had committed.  He personally supervised and participated in the group's efforts to find and destroy [the victim's] identification documents and to dispose of his body.  The record shows that the violent killing and the unlawful taking were two separate acts, performed for entirely different reasons. Because it is clear that Branch possessed no intent to steal at the moment the shooting occurred, we hold that the evidence was insufficient as a matter of law to support his conviction of robbery.

225 Va. at 95-96, 300 S.E.2d at 760.

In Bunch, the defendant was convicted of capital murder and sentenced to death for robbing and murdering a woman with whom he was having an intimate affair.  One of the issues raised by Bunch was the sufficiency of the evidence of robbery to support his capital murder conviction.  Bunch maintained "the evidence was sufficient to make a prima facie case of homicide and larceny,

- 12 -

but not of capital murder in the commission of robbery." 225 Va. at 439, 304 S.E.2d at 280. The Supreme Court found

> that on January 31, 1982, Bunch went to [the victim's] home with the intent to kill her and steal her property, that he did kill her as planned, and that he did steal property from her person. She may or may not have been alive at the time he stole her property, and she may even have been dead for some time when he accomplished the theft. Neither of these eventualities is material, however; <u>the important considerations are that robbery was the motive for the killing and that</u> Bunch had the intent to rob when he killed [the victim]. Nor does it make any difference whether, as Bunch asserts, "the items [stolen] could have been taken from parts of the residence away from where the victim was shot."

Id. at 440, 304 S.E.2d at 280-81 (emphasis added). The issue addressed in Bunch was whether a robbery was committed.

In Edmonds, a witness, Clark, saw appellant walking toward a small grocery store. See 229 Va. at 305, 329 S.E.2d at 809. Ten minutes later, another witness, McDaniel, found the store owner dead inside the store. See id. That witness "saw Edmonds and another man standing at the front door." Id. Edmonds left the scene when he heard the police sirens. See id. at 306, 329 S.E.2d at 810. Although a witness noticed "a stack of ones in the register" shortly before the murder, the police found no currency when they arrived. Id. A twelve-year-old witness looked through the store window just before McDaniel discovered the body and "saw a man he later identified as Edmonds 'stooping below the cash register.'" Id. Witnesses saw Edmonds with dollar bills after the murder. See id. Another witness

- 13 -

testified that the victim "had told her that Edmonds had stolen some watches from his store and was no longer welcome as a customer."  Id.  Another witness testified that Edmonds told her that the victim accused him of stealing the watches and "'said he was going to get [the victim].'"  Id.

After providing authorities with two earlier accounts incriminating someone else, Edmonds said he went to the store to buy a soft drink, at which time the victim aimed a pistol at him and asked about the stolen watches.  See id.  Edmonds told the victim he paid for the watches, but the victim cursed him and threatened to shoot him, so Edmonds threw a brick at the victim, striking him on the head.  The victim dropped the gun momentarily, and, when he picked it up again, Edmonds grabbed a "butcher knife and '[t]he man got cut.'"  Id. at 308, 329 S.E.2d at 811.  Edmonds claimed the victim was alive and calling for help when he left the store; on the way out, Edmonds said he "picked up a handkerchief and a bag of candy."  Id.  Edmonds denied taking the gun or the money.  See id.

Relying on Bunch, "Edmonds argue[d] that . . . the homicide offense d[id] not rise to the level of capital murder in the commission of robbery" because "the larceny occurred only after the killing was consummated and that the evidence [wa]s insufficient to prove that robbery was the motive for the killing."  Id. at 309-10, 329 S.E.2d at 812 (emphasis added).

Despite Edmonds' statement to police that the sole purpose

for going to the store was to buy a cold drink, the court found it unlikely that one accused of shoplifting would return to the shop to make a purchase.  See id. at 310, 329 S.E.2d at 812. The Court explained:

> Rejecting Edmonds' claim, the trial judge was justified in relying on the sworn testimony and the physical evidence adduced at trial.  All the offenses -- the initial assault, the fatal stabbing, and the larceny -- were committed at some point within the ten-minute interval between the time Margaret Clark saw Edmonds on his way to the store and the time Leonard McDaniel arrived. Death from the neck wound was not instantaneous.  [The victim] was calling for help as Edmonds was crouching behind the cash register, and it is reasonable to believe that the gag was applied to stifle further outcry and to facilitate the theft.
> In light of the inferences raised by this sequence of events and the time factor involved, we are of opinion that the evidence supports the conclusion that the killing and the theft were interdependent objects of a common criminal design, and we will affirm the conviction of capital murder in the commission of robbery.

Id. at 310, 329 S.E.2d at 812-13 (emphasis added).

In Edmonds, the Supreme Court did not use language requiring the Commonwealth to prove that the robbery was a motivating cause for the killing.  Instead, it found a sufficient causal connection between the murder and robbery to affirm the capital murder conviction by concluding "that the killing and the theft were interdependent objects of a common criminal design."  Id. at 310, 329 S.E.2d at 813.

- 15 -

In addition to these three cases cited by appellant, many other Supreme Court cases have interpreted the language used in Code § 18.2-31(4), "killing of any person in the commission of a robbery or attempted robbery," and have discussed the requisite relationship and causal connection between the murder and the robbery in order to sustain a capital murder conviction. We will analyze some of those cases in order to interpret further the statute and determine its proper application.

In Briley v. Commonwealth, 221 Va. 532, 273 S.E.2d 48 (1980), cert. denied, 451 U.S. 1031 (1981), Linwood Briley was convicted of capital murder in the commission of robbery. Briley and three accomplices accosted the victim outside a restaurant, robbed him at gunpoint of his wallet, ordered him into the victim's car, and transported the victim to an isolated location. See id. at 534-35, 273 S.E.2d at 50. When the victim "'started struggling'" at that location, Briley shot him. Id. at 535, 273 S.E.2d at 50. Fifteen to twenty minutes elapsed from the time the victim was robbed and seized until he was killed. See id. After driving around in the victim's car, Briley and his accomplices eventually stripped it of its parts. See id. at 536, 273 S.E.2d at 50. Briley's "major contention" on appeal was "that the trial court erred in refusing a defense instruction which would have permitted the jury to find that the robbery of [the victim] terminated at the . . . restaurant and,

- 16 -

therefore, that the defendant was guilty only of the non-capital offense of first degree murder in the subsequent killing." Id. at 540, 273 S.E.2d at 53. The Supreme Court found that the victim's car "was a fruit of the robbery" showing "conclusively that the violence against [the victim] and the trespass to his automobile combined and continued unabated" from the initial taking until the murder. Id. at 544, 273 S.E.2d at 55. Adapting language from Haskell v. Commonwealth, 218 Va. 1033, 243 S.E.2d 477 (1978), a felony-murder case, the Court ruled "that the killing involved here was so closely related in time, place, and causal connection as to make the killing, as a matter of law, a part of the same criminal enterprise." Id. at 544, 273 S.E.2d at 55-56 (emphasis added).

In Pope v. Commonwealth, 234 Va. 114, 116-17, 360 S.E.2d 352, 354 (1987), cert. denied, 485 U.S. 1015 (1988), Pope was convicted of capital murder under former Code § 18.2-31(d), now Code § 18.2-31(4), malicious wounding, attempted robbery and four counts of using a firearm. Pope contended "that the evidence was insufficient to support his conviction of robbery, and was consequently insufficient to establish the predicate for capital murder under Code § 18.2-31(d), which classifies as capital murder those killings which are perpetrated 'in the commission of robbery.'" Id. at 124, 360 S.E.2d at 359. He contended: (1) someone else stole the murder victim's purse after appellant fled the scene and while the murder victim's

- 17 -

sister, who Pope also shot, ran into the hospital and left the

murder victim in the car unattended for less than thirty

seconds; and (2) he removed the murder victim's "purse

surreptitiously before the shooting and concealed it on his

person" so as to break any temporal and causal connection

between the murder and robbery.  Id.  The Supreme Court found

that the first contention "framed a factual issue" that the jury

was entitled to conclude "was neither reasonable nor persuasive"

and that, under Briley, Pope's second contention was "fallacious

as matter of law."  Id. at 124-25, 360 S.E.2d at 359.

The Court explained:

> We decided in Linwood Earl Briley v.
> Commonwealth, . . . that when a killing and
> a taking of property are so closely related
> in time, place, and causal connection as to
> make them parts of the same criminal
> enterprise, the predicates for capital
> murder under Code § 18.2-31(d) are
> established.  Further, these relationships
> need not necessarily be jury questions.
> They may, in a proper case, be determined as
> a matter of law.

Id. at 125, 360 S.E.2d at 359 (citation omitted).

In LeVasseur v. Commonwealth, 225 Va. 564, 304 S.E.2d 644

(1983), the Supreme Court employed the above-quoted language

from Briley and then said:

> Applying these principles to the
> evidence before us, it is manifest that the
> robbery and the murder of Pamela Benner are
> even more inextricably connected than the
> crimes in Briley.  The victim was, in the
> absence of her family, the custodian of the
> home and its contents.  The property was

- 18 -

> stolen through the exercise of violence against her.  The bloodstains on the splintered doors to the locked bedrooms in which the stolen property was kept are circumstantial evidence that her ability to protect the property had been subdued by overwhelming violence before the theft occurred.  While it is impossible to ascertain the precise time of her death, in relation to the taking of the property, the Commonwealth's evidence shows that the defendant, having gone there to rob her, bound and beat her with a poker, before he went upstairs to the kitchen, leaving traces of blood and hair, to secure the ice pick and carving fork with which he then stabbed her repeatedly.
>
> The defendant's evidence does nothing to separate the crimes as to time, place, or causal connection.  Indeed, his version, if believed, makes it unmistakably clear that the robbery and the murder were a part of the same criminal enterprise.

Id. at 591, 304 S.E.2d at 658-59.

Similar language to that used in Pope and LeVasseur has been used in other Supreme Court cases to define capital murder "in the commission of robbery or attempted robbery" under Code § 18.2-31(4).  See George v. Commonwealth, 242 Va. 264, 277-78, 411 S.E.2d 12, 20 (1991), cert. denied, 503 U.S. 973 (1992); Quesinberry v. Commonwealth, 241 Va. 364, 368, 402 S.E.2d 218, 221 (1991); Poyner v. Commonwealth, 229 Va. 401, 405, 329 S.E.2d 815, 820 (1985); Whitley v. Commonwealth, 223 Va. 66, 73, 286 S.E.2d 162, 166, cert. denied, 459 U.S. 882 (1982); Patterson v. Commonwealth, 222 Va. 653, 656, 283 S.E.2d 212, 214 (1981).  All of these cases involved capital murder in the commission of

robbery, and all used substantially the same language used in Pope and LeVasseur to define capital murder.

ANALYSIS

Appellant's sufficiency argument is two-fold:  (1) whether robbery must be one of the motivating factors to convict someone of capital murder under Code § 18.2-31(4), and, if so, (2) whether the Commonwealth proved the robbery was a motivating factor for the murder.  According to appellant, the robbery was incidental to the murder and a mere afterthought.

Motive is not an essential element of murder.  See Ward v. Commonwealth, 205 Va. 564, 570, 138 S.E.2d 293, 297 (1964). However, motive is generally a relevant circumstance to establish intent when a conviction is based on circumstantial evidence.  See Smith v. Commonwealth, 220 Va. 696, 702, 261 S.E.2d 550, 554 (1980).

> Intent . . . is a requisite element in many crimes, but motive is not.  Motive is merely a circumstance tending to prove the guilt of the alleged perpetrator, as its absence may tend to show his innocence.  It is relevant and probative on the issue of identity of the criminal agent, but it is not an element of any crime.  "Motive and intent are not synonymous.  Motive is the inducing cause, while intent is the mental state with which the criminal act is committed . . . .  The prosecution is never required to prove motive, although it may do so."  Motive has never been a requisite element of the crime of murder in Virginia or in any other jurisdiction of which we are aware.

Cantrell v. Commonwealth, 229 Va. 387, 397, 329 S.E.2d 22, 28-29 (1985) (citations omitted); see also Brown v. Commonwealth, 238 Va. 213, 221, 381 S.E.2d 225, 230 (1989).

Based on language used by the Supreme Court and our analysis of extant case law, we believe that whether the robbery was a "motivating factor" for the murder is a circumstance that may be considered in proving whether the "killing and a taking of property are so closely related in time, place, and causal connection as to make them parts of the same criminal enterprise," Pope, 234 Va. at 125, 360 S.E.2d 359, and, therefore, "were interdependent objects of a common criminal design." Quesinberry, 241 Va. at 374, 402 S.E.2d at 224. However, we decline to hold that robbery as a motivating factor is a sine quo non to support a capital murder conviction under Code § 18.2-31(4). Evidence of motivation goes to a person's intent and can help prove that a robbery actually was committed or attempted, see George, 242 Va. at 279-80, 411 S.E.2d at 21-22 (evidence established that defendant "harbored intention" and, therefore, "was motivated" both to molest and to rob victim; holding that such evidence established murder "so closely related in time, place and causal connection to the robbery that the killing became part of the same criminal enterprise as the robbery"), or it may be employed to show that a possible post-murder robbery was sufficiently connected to the murder. Compare Whitley, 223 Va. at 72-74, 286 S.E.2d at 166-67 (where

defendant took victim's property after murder, Supreme Court rejected defendant's argument that intent to steal was formed after murder resulting in mere larceny and found sufficient evidence for jury to conclude that "murder was committed with intent to rob" to fit within capital murder statute), with Branch, 225 Va. at 95-96, 300 S.E.2d at 760 (no evidence of intent to rob where idea to take and destroy victim's identification from his wallet occurred only after alleged accidental murder; holding evidence insufficient as a matter of law to support robbery conviction).

Accordingly, we hold that in order for a murder to be committed "in the commission of robbery or attempted robbery" the killing must be "so closely related in time, place, and causal connection as to make the killing . . . a part of the same criminal enterprise." Briley, 221 Va. at 544, 273 S.E.2d at 56. In establishing this relationship, sufficient evidence must be presented from which the fact finder can conclude that the killing and robbery were "interdependent objects of a common criminal design." Edmonds, 229 Va. at 310, 329 S.E.2d at 813. In some situations, such as a post-murder theft of property, proof that robbery was the motive for the killing may help establish the requisite causal connection to support a verdict that a murder occurred in the commission of robbery. See Bunch, 225 Va. at 440, 304 S.E.2d at 280-81 (addressing defendant's argument that taking occurred one to two hours after murder and,

- 22 -

thus, was larceny rather than robbery and affirming based on evidence that robbery was motive for killing).  Therefore, motivation may be a factor subsumed in the more encompassing and comprehensive requirement that the murder and robbery be a part of the same criminal enterprise and interdependent objects of a common criminal design.

For example, where a murder follows a robbery closely in time and circumstances, it is reasonable to infer that the motive for the murder was to escape detection and/or eliminate witnesses.  See Poyner, 229 Va. at 423, 329 S.E.2d at 836.  In other words, where the predicate crime occurs first, it is enough if the murder and robbery share enough of a relationship or connection in time and purpose such that a fact finder can reasonably conclude a sufficient causal nexus exists between them.

Based on our interpretation of extant case law and the facts of this case, we need not rely on or limit our analysis merely to motivation.  Here, the robbery occurred before the murder;[2] therefore, the question is whether the murder and robbery were part of the same criminal enterprise and interdependent objects of a common criminal design.

> Where [a] defendant challenges the
> sufficiency of the evidence, it is our duty
> under familiar principles "to look to that
> evidence which tends to support the verdict

---

[2] Because the robbery preceded the murder, it cannot, as argued by appellant, be regarded an afterthought.

and to permit the verdict to stand unless plainly wrong. If there is evidence to sustain the verdict, this court should not overrule it and substitute its own judgment, even if its opinion might differ from that of the jury."

George, 242 Va. at 278, 411 S.E.2d at 20 (citation omitted). Thus, we look at the evidence before the jury, sitting as fact finder, and the reasonable inferences drawn from the evidence to determine whether sufficient evidence was before the jury from which it could find appellant guilty beyond a reasonable doubt.

On Saturday night, July 26, 1997, when Tibbs, Winckler, Cull and Bitner began discussing a plan to teach Hanna a lesson in the form of an "ass whipping," they may not have intended that the affair would end up in murder, robbery, and abduction. However, they entered into an enterprise known as concert of action, which is defined as "'action that has been planned, arranged, adjusted, agreed on and settled between parties acting together pursuant to some design or scheme.'" Rollston v. Commonwealth, 11 Va. App. 532, 542, 399 S.E.2d 823, 827 (1991).

In Spradlin v. Commonwealth, 195 Va. 523, 79 S.E.2d 443 (1954), the Supreme Court said:

If there is concert of action with the resulting crime one of its incidental probable consequences, then whether such crime was originally contemplated or not, all who participate in any way in bringing it about are equally answerable and are bound by the acts of every other person connected with the consummation of such resulting crime. The question of whether the offense is the natural and probable

> result of the intended wrongful act is
> usually for the jury.

Id. at 558, 79 S.E.2d at 445.

The jury as fact finder knew that Hanna was alive when the group made its last stop at Nash Road. Prior to that time, there was conversation about taking Hanna to a hospital, but this was rejected for fear of disclosure. Bitner "suggested that we cut out her tongue so she couldn't talk," and Winckler "said that we need to cut off her fingers so she couldn't write." Cull, Bitner, Winckler and Tibbs got out of the car and went to the trunk. Winckler forced a badly beaten Hanna to relinquish her rings and watch. The rings and watch were delivered pursuant to demand, after which Hanna was taken down a dirt road. At first, Hanna walked, but when unable to do so, the group carried her. En route down the dirt road, Bitner, Tibbs and Winckler were in possession of box cutter razor knives which they used to cut Hanna from time to time. Bitner testified that Hanna was bleeding "really, really bad" as she was carried down the dirt road. When the group arrived at a mud puddle, they stopped, and Tibbs and Winckler removed Hanna's clothing because it allegedly belonged to Tibbs. Bitner testified that Hanna "was pushed in the mud." Bitner further testified as follows during direct examination:

Q. What happened, she went down in the mud?

A. Uh huh.

- 25 -

Q. Was she on her back or on her stomach?

A. She was on her stomach.

Q. What happened when she went down
   in the mud on her stomach?

A. Domica [Winckler] stabbed her in
   the chest a couple of times with
   the box cutter.

Q. What did Kelley Tibbs do?

A. Just punched her and stuff.

Q. What did you do?

   *     *     *     *     *     *     *

A. I cut her on her throat.

   *     *     *     *     *     *     *

Q. What did you see Ms. Tibbs do at
   that point?

A. Choke her.

As the group and Hanna proceeded down the dirt road, Vaughn was in the car, unable to see them. Vaughn "heard a cry and then [she] heard another cry and then [she] heard the cry get muffled, something, and that was it." The dastardly deed was accomplished.

This case involved four codefendants who inflicted two beatings on the victim in two locations removed from each other. After the first attack, the codefendants transported Hanna to the second location and robbed her of her watch and jewelry. Immediately thereafter, appellant, Bitner and Winckler forcefully accompanied Hanna down the Nash Road path and

- 26 -

actively participated in causing her death.  The killing of Hanna immediately after she was robbed and taken from the trunk "was so closely related in time, place, and causal connection as to make the killing, as a matter of law, a part of the same criminal enterprise."  Briley, 221 Va. at 544, 273 S.E.2d at 55-56.  This temporal relationship established "that the killing and the theft were interdependent objects of a common criminal design."  Edmonds, 229 Va. at 310, 329 S.E.2d at 813.

Moreover, the jury could reasonably infer that Winckler, acting in concert with appellant in committing the murder, took Hanna's watch and participated with appellant in murdering Hanna so she could keep the watch and silence Hanna.  After the crime, Winckler kept the watch and was wearing it when the police arrested her.  Furthermore, two of Hanna's rings were never recovered, providing the jury with evidence that one of the other co-actors in the murder may have desired and retained Hanna's property.  From this evidence, the jury could have concluded that co-actor Winckler, at least, coveted Hanna's property and that appellant acted for the dual purpose of silencing Hanna and furthering Winckler's acquisition of Hanna's property.

The Commonwealth's evidence was competent, was not inherently incredible and was sufficient to prove beyond a reasonable doubt that appellant committed a murder in the

commission of robbery.  Accordingly, we affirm appellant's

capital murder conviction.

<u>Affirmed</u>.

Elder, J., dissenting.

I join generally in the majority's recitation of the facts and the law, but I disagree with its application of the law to the facts. Therefore, I respectfully dissent.

The relevant version of Code § 18.2-31 provided that "[t]he willful, deliberate and premeditated killing of any person in the commission of robbery or attempted robbery" constitutes capital murder. For a murder to be committed "in the commission of robbery or attempted robbery," the killing must be "so closely related in time, place, and causal connection as to make the killing . . . a part of the same criminal enterprise." Briley v. Commonwealth, 221 Va. 532, 544, 273 S.E.2d 48, 56 (1980) (emphasis added). In establishing this relationship, the record must contain sufficient evidence from which the fact finder can conclude that the killing and robbery are "interdependent objects of a common criminal design." Edmonds v. Commonwealth, 229 Va. 303, 310, 329 S.E.2d 807, 813 (1985). As the majority acknowledges, determining whether the record contains such evidence necessarily involves an examination of the perpetrators' intent. See slip op. at 21-22; Whitley v. Commonwealth, 223 Va. 66, 72-74, 286 S.E.2d 162, 166-67 (1982) (holding evidence sufficient to support finding that "murder was committed with intent to rob" to fit within capital murder statute but noting that proof of coexistence of intent to kill and intent to steal may not be required under the statute when

- 29 -

the killing and robbery are part of a continuing criminal enterprise).

Intent may and often must be proved by circumstantial evidence. See Whitley, 223 Va. at 73, 296 S.E.2d at 166. A perpetrator's motive in committing an offense, although not an element of murder, is a circumstance relevant to establishing intent. See Smith v. Commonwealth, 220 Va. 696, 702, 261 S.E.2d 550, 554 (1980). His conduct and statements also may be relevant circumstantial evidence of motive and, thus, intent. See Long v. Commonwealth, 8 Va. App. 194, 198, 379 S.E.2d 473, 476 (1989). Circumstantial evidence "is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis [flowing from the evidence] except that of guilt." Coleman v. Commonwealth, 226 Va. 31, 53, 307 S.E.2d 864, 876 (1983); see Hamilton v. Commonwealth, 16 Va. App. 751, 755, 433 S.E.2d 27, 29 (1993). Although an accused may try to prove his lack of intent by testifying about it or offering evidence of his statements to police or others, the trier of fact is entitled to assess the credibility of the testimony or statements and to reject them in whole or in part. See Pugliese v. Commonwealth, 16 Va. App. 82, 92, 428 S.E.2d 16, 24 (1993).

The majority asserts that "where a murder follows a robbery closely in time and circumstances, it is reasonable to infer that the motive for the murder was to escape detection [of the

robbery] and/or eliminate witnesses."  It cites Poyner v.

Commonwealth, 229 Va. 401, 432, 329 S.E.2d 815, 836 (1985), in

support of this proposition.  I agree that this inference is

appropriate where the only reasonable hypothesis flowing from

the evidence, viewed in the light most favorable to the

Commonwealth, is that the motive for the murder was, as stated,

to escape detection for the robbery.  In fact, this was the case

in Poyner, where the defendant robbed an ice cream store and

immediately shot the only witness.  See id.  The record provided

no evidence that the victim's body was "mutilated . . . [or]

raped" and, therefore, no evidence of any other motive or intent

for the murder.  See id.  Under those circumstances, the court

held the fact finder "could reasonably have concluded that [the

defendant] killed [the victim] to prevent her from calling for

help and to keep her from identifying him as the robber."  Id.

at 433, 329 S.E.2d at 836.

Similarly, in Whitley, the evidence, viewed in the light

most favorable to the Commonwealth, supported the jury's finding

that the defendant murdered the victim in order to steal her

car.  See Whitley, 223 Va. at 72-74, 286 S.E.2d at 166-67.  It

established that, on the night of the murder, the defendant's

car was "broken down," the defendant previously had expressed an

interest in buying a car from the victim's daughter, and the

defendant killed the victim, took her car keys and stole her

car.  See id. at 73-74, 286 S.E.2d at 166.  The defendant had

presented the hypothesis that his statements to police (in which he said that he entered the victim's house to use the phone and that the victim said something which "provoked the fatal attack") and the physical evidence (which established that he removed the victim's clothing and sexually assaulted her with two umbrellas) required a finding that "the killing was the act of a 'sexual psychopath' and that the larceny [of the automobile] was committed 'only as an after-thought.'"  Id. at 72-73, 286 S.E.2d at 166.  The Court held "the jury logically could have concluded that both sex and robbery motivated [the defendant's] conduct," despite the fact that the taking may not have occurred until after the victim's death and that the jury was entitled to reject the defendant's statements about what occurred and why.  Id. at 73-74, 286 S.E.2d at 166.  Once the jury rejected the defendant's statements, the only hypothesis flowing from the remaining evidence--viewed in the light most favorable to the Commonwealth--was that the defendant's desire to steal the victim's car was a motive for the murder, although the physical evidence supported a finding that he had multiple motives.

In appellant's case, in contrast to Whitley, the Commonwealth's evidence established merely the possibility of multiple intents.  The evidence did not exclude the reasonable hypothesis that the perpetrators acted with only one intent in killing the victim--to prevent her from identifying them as the

people who had viciously beaten and cut her--and that the robbery was, as appellant argues, merely an afterthought, even though it occurred before the killing. The Commonwealth's evidence makes clear that the perpetrators' original intent was to "kick [the victim's] ass" because she had lied to appellant. After inflicting the beating, they expressed fear that the victim "was going to tell," and they put her in the trunk of the car and discussed how to keep her from doing so. They then drove to another location where they stood around the trunk and told the victim to relinquish all of her jewelry. After she did so, they removed her from the trunk, walked her down a dirt road, and removed most of her clothing. They continued to kick, beat, cut and stab her, and she eventually died. Although two of the victim's rings were abandoned and others were never found, one of the perpetrators kept and wore the victim's watch.

Thus, the evidence, viewed in the light most favorable to the Commonwealth, establishes that the perpetrators acted with an intent to cover up the beating and that this was a motive for the victim's murder. Although they may also have acted with the dual intent to cover up the robbery, no direct evidence supports such a finding, and the circumstantial evidence that appellant or any of her accomplices harbored such an intent is minimal; the only such evidence is the fact of the robbery itself, Winckler's keeping the victim's watch, and the subsequent killing of the victim.

Another reasonable hypothesis flowing from the circumstantial evidence, even viewed in the light most favorable to the Commonwealth, is that appellant and her accomplices intended to kill the victim solely to cover up the beating. Thus, in contrast to Whitley, this hypothesis of innocence flows from the Commonwealth's evidence and does not require acceptance of the subsequent statements of appellant or her accomplices.

Therefore, although the evidence establishes that the robbery and murder were "closely related in time [and] place," I would hold that it fails, as a matter of law, to establish the "causal connection" necessary to support a finding that the killing and robbery were "interdependent objects of a common criminal design." The evidence fails to prove that this offense constituted murder "in the commission of robbery" and established, at most, robbery in the commission of murder, which does not meet the requirements of Code § 18.2-31. That appellant and her accomplices may have acted in concert in committing robbery and murder does not, without more, render the murder an act of capital murder.

For these reasons, I would reverse appellant's conviction for capital murder. Therefore, I respectfully dissent.