COURT OF APPEALS OF VIRGINIA


Present: Judge Annunziata, Senior Judge Duff and Judge Clements[*]
Argued at Alexandria, Virginia


DOMICA CHANTEL WINCKLER

                                          OPINION BY
v.    Record No. 1177-99-2      JUDGE ROSEMARIE ANNUNZIATA
                                          JULY 18, 2000
COMMONWEALTH OF VIRGINIA


           FROM THE CIRCUIT COURT OF CHESTERFIELD COUNTY
                    Herbert C. Gill, Jr., Judge

           D. Gregory Carr (Bowen, Bryant, Champlin &
           Carr, on briefs), for appellant.

           Robert H. Anderson, III, Assistant Attorney
           General (Mark L. Earley, Attorney General,
           on brief), for appellee.


     Domica Winckler appeals from her conviction of capital

murder, arising from the July 27, 1997 robbery and murder of

Stacy Hanna.  Winckler contends 1) the trial court erred in

refusing to instruct the jury that to support a conviction for

capital murder, robbery must have been a motivating factor in

the killing of Hanna; and 2) the Commonwealth offered

insufficient evidence to prove capital murder under the theory

of "murder committed in the commission of robbery."  We find no

error and affirm.

---

     [*] Judge Jean Harrison Clements took part in the
consideration of this case by designation, pursuant to Code
§ 17.1-400, recodifying Code § 17-116.01.

FACTS

We review the evidence pertinent to a defendant's challenged jury instruction in the light most favorable to the defendant. See Martin v. Commonwealth, 13 Va. App. 524, 526, 414 S.E.2d 401, 401 (1992) (en banc). On July 4, 1997, Stacy Hanna came to the City of Richmond from Lynchburg and moved into an apartment on Belmont Avenue, which she shared with Dana Vaughn, Robin Thurkill, Kelly Tibbs, and occasionally Tracy Bitner. Winckler lived nearby and was part of the social circle that included Hanna and her apartment mates. These women were all lesbians. Bitner and Tibbs previously had been romantically involved but had ended the relationship prior to Hanna's arrival in Richmond. Soon after Hanna moved into the Belmont Avenue apartment, she developed a romantic attachment to Tibbs, but Hanna "ended up liking [Tibbs] more than [Tibbs] liked [Hanna]." On July 24, 1997, Tibbs and Winckler had a violent altercation with Hanna, because Tibbs believed Hanna had lied about a romantic relationship between Tibbs and another individual.

On the afternoon of Saturday, July 26, 1997, Vaughn, Hanna, and Tibbs met in the Belmont Avenue apartment with Bitner, Winckler, and Stephanie Cull, another member of Hanna's circle of friends. Winckler, Tibbs, Bitner, and Cull left in Cull's car to pick up Thurkill from her job at a local restaurant. On the way to pick up Thurkill, the women began to complain about

Hanna's recent fabrications concerning Tibbs, and they agreed that "they were going to kick [Hanna's] butt, teach her a lesson for lying."  Later in the evening, these women, along with Hanna and Vaughn, attended a party at a friend's home, during which Vaughn fell ill.  The group left the party in Cull's car.  Cull drove the vehicle, while Tibbs and Bitner rode in the front seat; Hanna, Vaughn, and Winckler rode in the back.  They proceeded to Marsh Field in Chesterfield County and parked next to a small building.  There, all the women exited the car except for Hanna and Vaughn, who continued to feel ill.  Tibbs eventually returned to the car and remained with Vaughn while Hanna joined the others, who were standing just a few feet in front of the vehicle.  The women had decided to give Hanna a "butt kicking" for lying about Tibbs.

Soon after Hanna exited the vehicle and joined Winckler, Bitner, and Cull, Tibbs also rejoined the group, leaving Vaughn alone in the car.  The women walked to the other side of the small building, where Tibbs and Winckler began to hit and kick Hanna.  Bitner also joined in the assault.  Bitner, Winckler, and Tibbs began to cut Hanna with razor-bladed box cutters.  Within minutes, Vaughn observed Hanna's back covered with blood.  Vaughn also saw Winckler strike Hanna with a belt and then throw a cinder block on Hanna as she lay on the ground.  The assault lasted approximately ten minutes, after which Tibbs, Bitner,

Cull, and Winckler returned to the car and drove a "couple [of] miles" away, leaving Hanna at Marsh Field. When the women became concerned that Hanna would report the assault, they returned to Marsh Field. They concluded it was necessary to kill and "get rid of" Hanna.

Upon returning to Marsh Field, Cull told the other women to put Hanna in the trunk of the car because Hanna "was going to get blood everywhere." Winckler and Tibbs did so despite Hanna's pleas to be allowed to ride in the passenger compartment. The women drove away from the scene for a second time, with Hanna striking the interior of the trunk with her hands. In response to Hanna's banging on the trunk, Cull stopped the car; Winckler got out and opened the trunk. Hanna asked to be taken to a telephone so she could call her mother; Winckler said "no," shut the trunk and got back in the car.

The women continued driving and discussed whether they should take Hanna to a hospital. Winckler and Bitner opposed doing so, fearing Hanna would report their actions. Bitner stated that Hanna's "tongue needed to be cut out" so she could not report them; Winckler stated that Hanna's "fingers need[ed] to be cut off" so she could not make a written report. Cull stopped the car along an unidentified back road. All the women except Vaughn got out and opened the trunk for a second time.

- 4 -

By this time, Hanna was "bleeding really bad."  Winckler demanded Hanna's rings and watch.  Hanna refused at first but finally complied, asking that she be allowed to keep one ring. Winckler refused.  During this stop, Cull cut Hanna on the leg with a box cutter and at least one of the women spat on her. After they sealed Hanna in the trunk again, they drove on.

The group finally arrived at Nash Road, where they got Hanna out of the trunk and walked her down the deserted road. Cull cut Hanna on the back with a box cutter, and Hanna fell to the ground.  Bitner, Tibbs, and Winckler dragged her approximately 100 yards further and there stopped to remove Hanna's clothes, which belonged to Tibbs.  Winckler stabbed Hanna in the chest with a box cutter and held her in the mud while Bitner slit Hanna's throat with another box cutter. Winckler and Bitner returned to the car, Tibbs remaining with Hanna for a few more minutes.  Once back at the car, Bitner boasted that she had cut Hanna's throat, stuffed mud in her mouth, and stabbed Hanna "near the heart saying I want your heart bitch, give me your heart, why won't you die."  Winckler admitted she stabbed Hanna "over and over again" as well, and Tibbs said she had "stuck a stick" in Hanna's chest.  Once the women returned to the car, they left the scene.  As they drove away, Winckler announced that if any of them reported what had

just happened, "the same thing could happen to them." The women disposed of Hanna's blood-stained clothes and other evidence in a trash receptacle near Matchpoint Apartments, then returned to the Belmont Avenue apartment and cleaned themselves. Tibbs later told Vaughn that one of them had carved the word "liar" in Hanna's back.

On Sunday, July 27, 1997, City of Richmond and Chesterfield County police officers went to the Belmont Avenue apartment to investigate and later took the women to the Richmond police department for questioning. Chesterfield County Detective Rick Mormando interviewed Winckler and taped her statement. During the interview, Mormando recovered Hanna's watch from Winckler's wrist, and Winckler admitted taking it from Hanna while Hanna was in the trunk of Cull's car. Winckler told Mormando that when she and the other women had opened the trunk for the second time on the previous night, she told Hanna, whom she described as "scared sh--less," to "give me your watch, [and] give me your rings." When asked why she took the watch, Winckler replied, "I don't know. I just liked it." She stated that Hanna was physically incapable of resisting when Winckler demanded the watch and rings. She further stated that Hanna only surrendered the watch and rings because "she was scared sh—-less that [I

- 6 -

was] going to do something else to her."  Winckler told Mormando that she and the other women had already decided to kill Hanna when they drove to Nash Road.  She also confessed that she stabbed Hanna in the chest and "tried to push her face in the mud . . . to suffocate her . . . ."

On January 14, 1998, a jury found Winckler guilty of robbery, abduction, and capital murder.  The jury fixed her sentence at thirty years incarceration for the robbery conviction, ten years incarceration for the abduction conviction, and death for the capital murder conviction.  The trial court set aside the death sentence and imposed a sentence of imprisonment for life on the capital murder conviction.  This appeal followed.

Winckler contends:  1) the trial court erred by refusing to instruct the jury that, to convict Winckler of capital murder, robbery must have been a "motivating factor" for the killing; and 2) the evidence was insufficient to prove that robbery motivated Winckler to kill Hanna and the trial court, therefore, should either have struck the Commonwealth's evidence on the capital murder charge or set aside Winckler's conviction for capital murder.

<u>JURY INSTRUCTION ON CAPITAL MURDER</u>

Winckler proffered two jury instructions on capital murder,[1]
which the trial court refused.[2]  Winckler contends the court's

---

[1] Code § 18.2-31 defines capital murder.  The statute
provides, in pertinent part:

> The following offenses shall constitute
> capital murder, punishable as a Class 1
> felony:
>
> *     *     *     *     *     *     *
>
> 4.  The willful, deliberate and premeditated
> killing of any person in the commission of
> robbery or attempted robbery.

[2] The instructions were as follows:

Instruction A:

> The defendant is charged with the crime of
> capital murder.  The Commonwealth must prove
> beyond a reasonable doubt each of the
> following elements of that crime:
>
> 1.  That Stacy Hanna was killed; and
> 2.  That the killing was willful,
>     deliberate, and premeditated; and
> 3.  That the killing occurred during the
>     commission of a robbery; and
> 4.  That Domica Winckler killed Stacy Hanna.
>
> If you find from the evidence that the
> Commonwealth has proved beyond a reasonable
> doubt each of the above elements of the
> offense as charged, then you shall find the
> defendant guilty and shall not fix the
> punishment until your verdict has been
> returned and further evidence is heard by
> you.
>
> If you find that the Commonwealth has failed
> to prove beyond a reasonable doubt any one
> or more of the elements of the offense, then

- 8 -

ruling constituted reversible error, arguing that the two proffered instructions were necessary and proper statements of applicable law requiring the Commonwealth to prove that robbery was a motivating factor for the homicide in order to sustain a conviction of capital murder.

The issues raised on appeal are identical to those in our recent decision in <u>Tibbs v. Commonwealth</u>, 31 Va. App. 687, 525 S.E.2d 579 (2000), which governs this case.  In <u>Tibbs</u>, we held that to support a capital murder conviction under Code § 18.2-31(4), the Commonwealth was not required to prove the robbery was a motivating factor for the homicide that was committed.  <u>See</u> <u>id.</u> at 705, 525 S.E.2d at 587-88.  Rather, a conviction for capital murder will be sustained on appeal where "sufficient evidence [is] presented from which the fact finder can conclude that the killing and robbery were 'interdependent

---

you shall find the defendant not guilty of capital murder.

Instruction B:

The [c]ourt instructs the jury that "murder in the commission of robbery" is a killing which takes place before, during, or after the robbery, and is so closely related thereto in time, place, and causal connection as to make the killing part of the same criminal enterprise as the robbery.

The Commonwealth must also prove that the robbery was a motivating factor for the killing.

- 9 -

objects of a common criminal design.'"  Id. at 706, 525 S.E.2d at 588 (quoting Edmonds v. Commonwealth, 229 Va. 303, 310, 329 S.E.2d 807, 813, cert. denied, 474 U.S. 975 (1985)).

Based on our decision in Tibbs and the case law which underlies it, we find that the proposed instructions misstated the law and that the trial court did not err in refusing to instruct the jury that robbery must have been a motivating factor for Hanna's murder.

SUFFICIENCY OF THE EVIDENCE TO PROVE CAPITAL MURDER

"In reviewing the sufficiency of evidence on appeal, 'the appellate court must examine the evidence and all inferences reasonably deducible therefrom in the light most favorable to the Commonwealth, the prevailing party in the trial court.'" Taylor v. Commonwealth, 31 Va. App. 54, 64, 521 S.E.2d 293, 298 (1999) (en banc) (quoting Commonwealth v. Jenkins, 255 Va. 516, 521, 499 S.E.2d 263, 265 (1998)).  We find the evidence sufficient to support Winckler's conviction of capital murder.

"Murder in the commission of a robbery is a killing which takes place before, during, or after the robbery and is so closely related thereto in time, place, and causal connection as to make the killing part of the same criminal enterprise as the robbery."  George v. Commonwealth, 242 Va. 264, 277-78, 411 S.E.2d 12, 20 (1991) (citations omitted).  As noted in Tibbs, to sustain a conviction for capital murder, "sufficient evidence

- 10 -

must be presented from which the fact finder can conclude that the killing and robbery were 'interdependent objects of a common criminal design.'"  31 Va. App. at 706, 525 S.E.2d at 588. Where the defendant is motivated by the dual purpose of robbing the victim and committing another felonious act against the victim that results in death, the robbery and murder are parts of the same criminal enterprise.  See George, 242 Va. at 280, 411 S.E.2d at 21-22.  The defendant's possession of some "fruit of the robbery" may show "conclusively that the violence against [the victim] and the trespass to his [property]" are "so closely related in time, place, and causal connection as to make the killing, as a matter of law, a part of the same criminal enterprise [as the robbery]."  Briley v. Commonwealth, 221 Va. 532, 544, 273 S.E.2d 48, 55-56 (1980) (citations omitted).

We view the evidence in the light most favorable to the Commonwealth.  See Taylor, 31 Va. App. at 64, 521 S.E.2d at 298. Winckler does not deny her participation in Hanna's murder.  She concedes that she was motivated at the outset of the evening to cause grievous physical harm to Hanna.  In the course of that evening, as Winckler and her cohorts were transporting the weak and badly injured Hanna to the site where they planned to kill her, the group stopped, opened the trunk of the car, and Winckler demanded that Hanna surrender her watch and jewelry. Hanna protested, but her will was overborne by Winckler due to

Hanna's state of helplessness and terror.  Winckler then sealed Hanna in the trunk again and the group continued on to the location where they murdered her.

Hanna's helplessness and intimidation were the direct result of the initial assault committed by Winckler, Tibbs, and Bitner.  Her helpless and intimidated state was magnified and exacerbated by her confinement in the trunk of Cull's car, from which she pleaded to be released.  Winckler's demand for and acquisition of Hanna's property took advantage of Hanna's extremely debilitated condition, which Winckler had helped to create.  In addition, Winckler and her companions attempted to conceal their crimes of assault and battery and robbery by taking the helpless and terrified Hanna to a deserted location and murdering her.  Winckler was found soon after the murder in possession of a "fruit of the robbery," viz. Hanna's watch.  Possession of the "fruit of the crime," together with the other evidence in the case, may show "conclusively that the violence against [the victim] and the trespass to [her property]" were "so closely related in time, place, and causal connection as to make the killing, as a matter of law, a part of the same criminal enterprise [as the robbery]."  Briley, 221 Va. at 544, 273 S.E.2d at 55-56.

Based upon this record, we find the jury had sufficient evidence upon which to conclude beyond a reasonable doubt that

the robbery and murder were interdependent objects of a common criminal design, and, accordingly, to find Winckler guilty of capital murder. For the reasons stated in this opinion, we affirm Winckler's conviction.

<u>Affirmed</u>.
