# COURT OF APPEALS OF VIRGINIA

### Record No. 1841-24-4

JAMES RAY WILLIAMS

v.

COMMONWEALTH OF VIRGINIA

Present: Judges Friedman, Chaney and Duffan

Argued at Fredericksburg, Virginia

Opinion Issued April 28, 2026[*]

### FROM THE CIRCUIT COURT OF ARLINGTON COUNTY
Judith L. Wheat, Judge

Brett P. Blobaum, Senior Appellate Attorney (Virginia Indigent Defense Commission, on briefs), for appellant.

Mason D. Williams, Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

### MEMORANDUM OPINION BY
### JUDGE FRANK K. FRIEDMAN

A jury convicted James Ray Williams of second-degree murder and use of a firearm in the commission of a felony. The Circuit Court of Arlington County sentenced him to 33 years of incarceration. On appeal, Williams asserts that the trial court improperly refused his voluntary manslaughter instruction. He also contends that the trial court erroneously admitted the Death Scene Investigation Report as part of the autopsy. Finally, Williams challenges the trial court's admission of several text messages under Virginia Rule of Evidence 2:404(b). For the following reasons, we affirm the trial court's judgment.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

BACKGROUND

*Facts*

Around March 22 or 23, 2023, Maurice Massey was staying at his brother's apartment on North Thomas Street in Arlington County. In the early hours of March 25, 2023, Sean Bowman and Nicole Bailey unexpectedly arrived at the North Thomas apartment. Massey had met Bowman several times but had not met Bailey. Massey let Bowman and Bailey into the apartment. The three socialized together, using drugs and listening to music.

Throughout the early morning hours of March 25, 2023, both Massey and Bowman contacted Williams asking to purchase MDMA[2]; Massey had previously purchased drugs from Williams. But Williams was not at his apartment. Bowman left the North Thomas apartment at least twice during this period. Massey did not know it at the time, but he later learned that when Bowman left the North Thomas apartment, he went to Williams' apartment several blocks away.

Sometime after 5:00 a.m., Massey walked to Williams' apartment to buy drugs. Williams' apartment was about a 10-minute walk from Massey's brother's place. Williams told Massey to come alone because he did not trust Bowman. At 5:40 a.m., Massey texted Williams that he was "here." Williams soon arrived at his apartment with a female companion.

When Massey and Williams entered the apartment, Williams could not find his drugs. Williams initially thought that his companion had taken the drugs. But after Massey observed that the window was open and the blinds were askew, Williams began accusing Bowman and Massey of stealing his drugs. Massey repeatedly denied doing so. But he told Williams that Bowman had left the North Thomas apartment several times that morning.

---

[2] MDMA is a Schedule I controlled substance commonly known as "ecstasy" or "Molly." *See* Code § 54.1-3446; *Woodard v. Commonwealth*, 61 Va. App. 567, 569 (2013).

Williams said he was going to the North Thomas apartment to "teach [Bowman] a lesson." At the time, Massey believed that Williams would "beat . . . up" Bowman and take his drugs back. Williams smoked PCP on their walk to the North Thomas apartment, and he made a phone call outside when they arrived.

When Massey and Williams entered the North Thomas apartment, Bowman was asleep in the bedroom. Williams drew a small silver handgun, pointed it at Bailey, and ordered her to sit in a chair in the bedroom. Williams directed Massey to hold Bowman down so Williams could search him. When Massey hesitated, Williams pointed the gun in his direction. Massey grabbed Bowman's wrists and ankles. Williams sat on Bowman, held the gun to his head, and searched his pockets. Williams told Bowman to wake up and tell him where his "shit [was] at."

Williams then shot Bowman in the face at close range. Massey and Bailey both attempted to flee. Williams ordered Bailey into the closet, but she did not comply, and Massey said she had nothing to do with the drug theft. Massey and Bailey then heard a second shot, but in the chaos, neither saw where the firearm was.

As Massey and Bailey exited the apartment and went down the stairs, Williams followed them. He told them to leave and never return to Virginia. Massey and Bailey paid a man they encountered in the parking lot to drive them to the Washington, D.C., area.[3] Neither Massey nor Bailey called the police that night.

Massey and Bailey stayed together for several days in Washington, D.C., before parting ways. Massey later told his mother a version of what happened on March 25, 2023, and his mother informed her cousin, a police officer. On March 28, 2023, Arlington County Police Officers discovered Bowman's body inside the North Thomas apartment.

---

[3] They attempted to leave in Massey's vehicle, but it would not start.

The medical examiner confirmed that Bowman died from two gunshot wounds to the head. Officers located two .25 caliber cartridge casings in the bedroom of the apartment but never recovered the weapon used to kill Bowman. Through reviewing evidence, including a large quantity of surveillance video from the apartment complex, investigators developed Williams as a suspect. Williams' fingerprints were found on a blender cup and several liquor bottles in the apartment.

Police officers arrested Williams on March 31, 2023. They seized what they believed—based on the surveillance footage—were the shoes and trench coat Williams wore on the night of the shooting.

*Procedural History*

A grand jury charged Williams with first-degree murder, use of a firearm in the commission of a felony, and abduction. It also charged Massey with first-degree murder as a principal in the second degree. A jury acquitted Massey of that charge several months before Williams' trial.

Both Massey and Bailey testified at trial. As relevant here, Bailey testified that while she, Bowman, and Massey socialized at the North Thomas apartment, Bowman stated that he was going to "pick something up" and left for 15 to 20 minutes. When he returned, he was sweaty and confused. Before he left for a second time, Bowman asked if Bailey wanted to join him, but she declined. Bowman was gone a little longer that time and returned with "money in his hand."

Massey then left for approximately 30 minutes; when he returned, Bailey saw Williams in the apartment doorway. Williams drew a firearm, "backed her into" the bedroom where Bowman slept, and ordered her to sit in the chair and she "would not die." According to Bailey, before Williams shot Bowman in the face, he stated: "Motherfucker, you know what you did." Bailey averred that she and Massey fled the apartment, and that Massey refused her demand that he call the police.

The medical examiner testified in detail about his autopsy report. The Commonwealth sought to include in the autopsy report a one-page Death Scene Investigation Report written by Investigator Madelyn Anderson. The report identified Bowman as the decedent, described his clothing, and listed some of his physical characteristics. In a short narrative, the report stated the date and time the officers discovered Bowman's body, described the death scene, and briefly recounted the processing of the body and the scene. The report characterized Bowman's death as an "apparent homicide."

Williams objected to the Death Scene Investigation Report on hearsay grounds because Anderson did not testify at trial. The Commonwealth responded that the Investigation Report was admissible under Code § 19.2-188.[4] The trial court overruled Williams' objection and admitted the Death Scene Investigation Report as part of the autopsy report.

The Commonwealth also sought to introduce text messages extracted from Williams' phone. The Commonwealth asserted that several texts showed that Williams engaged in drug trafficking at the time of the killing. It argued that Williams' drug trafficking was relevant because it established his motive for killing Bowman—Williams believed that Bowman stole drugs from him. Williams responded that the challenged texts were inadmissible bad act evidence under Virginia Rule of Evidence 2:404(b). The trial court overruled Williams' objections to most of the contested texts. It concluded that the texts were relevant to Williams' alleged motive. The trial court also determined that the probative value of the texts outweighed any prejudice.

At the close of all the evidence, Williams proffered jury instructions that would have allowed the jury to convict him of the lesser-included offenses of second-degree murder and

---

[4] Under Code § 19.2-188, a medical examiner's autopsy report, when "duly attested," is admissible in evidence.

voluntary manslaughter. The Commonwealth opposed the voluntary manslaughter instruction, arguing that there was no evidence that Williams killed Bowman in the heat of passion. Williams noted that the Commonwealth's proffered malice instruction already defined heat of passion and that Massey testified that Williams was upset.

The trial court refused the voluntary manslaughter instruction, finding that there was not a scintilla of evidence of reasonable provocation for the killing. The jury convicted Williams of second-degree murder and using a firearm in the commission of a felony.[5] The trial court then sentenced Williams to 33 years of incarceration. Williams now appeals, challenging the trial court's orders refusing the voluntary manslaughter instruction, admitting the Death Scene Investigation Report, and admitting the challenged texts.

ANALYSIS

I. Voluntary Manslaughter Instruction

"As a general rule, the matter of granting and denying instructions . . . rest[s] in the sound discretion of the trial court." *King v. Commonwealth*, 64 Va. App. 580, 586 (2015) (en banc) (alterations in original) (quoting *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009)). "The trial court's 'broad discretion in giving or denying instructions requested' is reviewed for an abuse of discretion." *Id.* (quoting *Gaines v. Commonwealth*, 39 Va. App. 562, 568 (2003) (en banc)). This Court will find an abuse of discretion only when "reasonable jurists could not differ." *Hicks v. Commonwealth*, 71 Va. App. 255, 275 (2019). "[W]hen reviewing a trial court's refusal to give a proffered jury instruction, we view the evidence in the light most favorable to the proponent of the instruction." *Dandridge v. Commonwealth*, 72 Va. App. 669, 676 (2021) (quoting *Lienau v. Commonwealth*, 69 Va. App. 254, 260 (2018)).

---

[5] The jury acquitted him of abduction.

- 6 -

"A reviewing court's responsibility in reviewing jury instructions is 'to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises.'" *Fahringer v. Commonwealth*, 70 Va. App. 208, 211 (2019) (quoting *Darnell v. Commonwealth*, 6 Va. App. 485, 488 (1988)). "Although a defendant 'is entitled to an instruction upon his theory of the case,'" the defendant's proffered instruction must be "supported by *some appreciable evidence*." *Williams v. Commonwealth*, 64 Va. App. 240, 246 (2015) (quoting *Harris v. Commonwealth*, 134 Va. 688, 695 (1922)). "Thus, it is not error to refuse an instruction when there is no evidence to support it." *Id.* at 247 (quoting *Commonwealth v. Sands*, 262 Va. 724, 729 (2001)). "A defendant is entitled to have the jury instructed only on those theories of the case that are supported by [more than a scintilla of] evidence." *King*, 64 Va. App. at 587 (alteration in original) (quoting *Eaton v. Commonwealth*, 240 Va. 236, 255 (1990)). "'The weight of the credible evidence that will amount to more than a mere scintilla . . . is a matter to be resolved on a case-by-case basis' by assessing the evidence in support of a proposition against the 'other credible evidence that negates' it." *Woolridge v. Commonwealth*, 29 Va. App. 339, 348 (1999) (alteration in original) (quoting *Brandau v. Commonwealth*, 16 Va. App. 408, 411-12 (1993)).

"[I]n Virginia, criminal homicide is divided into two categories: murder and manslaughter. 'Murder' is the unlawful killing of another with malice. 'Manslaughter, on the other hand, is the unlawful killing of another without malice.'" *Dandridge*, 72 Va. App. at 681 (quoting *Canipe v. Commonwealth*, 25 Va. App. 629, 642 (1997)). Under Virginia law, "every unlawful homicide is presumed to be murder of the second degree." *Tizon v. Commonwealth*, 60 Va. App. 1, 10-11 (2012) (quoting *Pugh v. Commonwealth*, 223 Va. 663, 667 (1982)).

"Voluntary manslaughter is a lesser-included offense of second-degree murder." *Dandridge*, 72 Va. App. at 680. "[T]o reduce a homicide from murder to voluntary manslaughter, the killing must have been done in the heat of passion and upon reasonable provocation. Malice and

heat of passion are mutually exclusive; malice excludes passion, and passion presupposes the absence of malice." *Id.* at 681 (quoting *Canipe*, 25 Va. App. at 643). "Heat of passion refers to the *furor brevis* which renders a man deaf to the voice of reason." *Id.* (quoting *Woods v. Commonwealth*, 66 Va. App. 123, 131 (2016)). It may be provoked by "rage, fear, or a combination of both." *Witherow v. Commonwealth*, 65 Va. App. 557, 567 (2015) (quoting *Barrett v. Commonwealth*, 231 Va. 102, 106 (1986)). Heat of passion negates malice when the provocation causes the defendant to "act on impulse without conscious reflection." *Dandridge*, 72 Va. App. at 681 (quoting *Witherow*, 65 Va. App. at 567).

"'As a general rule, whether provocation, shown by credible evidence, is sufficient to engender the *furor brevis* necessary to rebut the presumption of malice arising from a homicide is a question of fact' to be decided by the jury." *Id.* at 682 (quoting *Woods*, 66 Va. App. at 131-32). "Only when the trial court, giving the defendant the benefit of every reasonable inference from the evidence, can say that the minds of reasonable men could not differ does the question become [one] of law." *McClung v. Commonwealth*, 215 Va. 654, 656 (1975).

It is well-settled, however, that "[w]ords alone, no matter how offensive or insulting they may be, are never sufficient provocation to reduce the offense of murder to manslaughter." *Rhodes v. Commonwealth*, 41 Va. App. 195, 199 (2003); *see also Martin v. Commonwealth*, 184 Va. 1009, 1016-17 (1946). Thus, a court need not instruct a jury on voluntary manslaughter if the evidence shows that the defendant was provoked by nothing more than "mere words." *Byrd v. Commonwealth*, 89 Va. 536, 541 (1893); *see Caudill v. Commonwealth*, 27 Va. App. 81, 85 (1998) (holding that the "evidence was insufficient as a matter of law to prove 'heat of passion'" where "at most," the appellant and victim "exchanged 'harsh words' before the attack"). This is so even when the actions or events described in those words could, themselves, amount to reasonable provocation. Adultery, for example, is the prototypical example of reasonable provocation. *See, e.g.*, *M'Whirt's*

- 8 -

*Case*, 44 Va. (3 Gratt.) 594, 606 (1846). Yet in *Lewis v. Commonwealth*, No. 0219-24-1, slip op. at 31-32, 2025 Va. App. LEXIS 412, at *46-47 (July 22, 2025),[6] the trial court was not required to instruct the jury on voluntary manslaughter where the defendant killed his wife after she admitted to cheating on him. We held there that "even an admission of that magnitude" could not rise to the level of reasonable provocation because it "consisted of words alone." *Id.*, slip op. at 32, 2025 Va. App. LEXIS 412, at *47; *see also Williams*, 64 Va. App. at 252-53 (holding that defendant was not reasonably provoked where he was told several days earlier that his friend had been murdered).

Here, even in best light to Williams, the evidence shows only that Massey insinuated that Bowman stole Williams' drugs. So even if Bowman's alleged burglary would have constituted reasonable provocation, Massey's "mere words" describing said burglary would be "insufficient as a matter of law to prove 'heat of passion.'" *Caudill*, 27 Va. App. at 85.

Moreover, although Williams was angry with Bowman, there was not more than a scintilla of evidence that rage or fear drove Williams to kill Bowman on impulse without conscious reflection. *Dandridge*, 72 Va. App. at 681; *Witherow*, 65 Va. App. at 567. When he discovered the missing drugs, Williams told Massey that he was going to the North Thomas apartment to teach Bowman a lesson. Williams then walked several blocks to the North Thomas apartment and even made a phone call before entering. Once inside, he held Bailey at gunpoint, sat on Bowman, directed Massey to hold him, and searched him. Williams then brandished the firearm at Bowman's head and demanded the return of his drugs before shooting Bowman in the face at close range. After the shooting, he allowed Massey and Bailey to leave after demanding that they never return.

Taken as a whole, there is no appreciable evidence that Williams was deaf to the voice of reason when he killed Bowman. Rather, the evidence proved that, upon concluding that Bowman

---

[6] We cite unpublished cases for their persuasive value, not as binding authority. Rule 5A:1(f).

stole from him, Williams made a conscious and calculated decision to confront him at the North Thomas apartment. Massey's and Bailey's accounts of the shooting itself describe a man seeking to control the scene, not one blinded to conscious reflection by rage. Because there was no evidence of reasonable provocation, and not more than a scintilla of evidence to support the theory that Williams killed Bowman in the heat of passion, the trial court properly refused Williams' voluntary manslaughter instruction.[7]

II. Death Scene Investigation Report

This Court reviews a trial court's evidentiary decisions for abuse of discretion. *Howard v. Commonwealth*, 74 Va. App. 739, 753 (2022). We will find an abuse of discretion only when "reasonable jurists could not differ." *Hicks*, 71 Va. App. at 275.

Under Code § 19.2-188, "[r]eports of investigations made by the Chief Medical Examiner, his assistants or medical examiners, and the records and certified reports of autopsies made under the authority of Title 32.1" are admissible "as evidence in any court . . . proceeding." Code § 19.2-188(A). Williams asserts that this provision does not apply to the Death Scene Investigation Report because its author, Investigator Anderson, did not work in the office of the Chief Medical

---

[7] Williams also argues that, because of the Commonwealth's proffered jury instructions that defined heat of passion in the malice instruction, heat of passion "was the law of the case." We disagree. We confronted a similar situation in *Rhodes v. Commonwealth*, 41 Va. App. 195 (2003). There, the trial court gave an instruction on voluntary manslaughter but refused the defendant's proffered instruction on heat of passion (in other words, the opposite of the situation here). *Id.* at 198-99. Finding that there was not a scintilla of evidence to support *either* the voluntary manslaughter instruction or the proffered heat of passion instruction, we affirmed. *Id.* at 201-02. Even though neither party objected to the voluntary manslaughter instruction (so it was the law of the case), we resisted the idea that "an instruction without evidentiary support is properly given because it clarifies or develops law presented in another instruction that is also without evidentiary support." *Id.* at 202. And we held that an erroneous instruction does not "derive[] validity" just because it is being used "to explain another instruction, which itself has been erroneously given, albeit without objection." *Id.* Here, similarly, we conclude that there was not a scintilla of evidence to support Williams' proffered voluntary manslaughter instruction; the fact that neither party objected to the heat of passion instruction does not change this conclusion.

Examiner. Thus, Williams contends, the trial court should have excluded the report as inadmissible hearsay because Anderson did not testify at trial.

Assuming without deciding that the trial court erred in admitting the Death Scene Investigation Report, we conclude that any such error was harmless.[8] "[H]armless error review is required in all cases, unless otherwise provided by . . . statute." *Commonwealth v. Kilpatrick*, 301 Va. 214, 216 (2022); *see* Code § 8.01-678. This Court will uphold a trial court's decision on the ground that an alleged evidentiary error is harmless if we conclude "that the error did not influence the jury[] or had but slight effect." *Id.* (alteration in original) (quoting *Clay v. Commonwealth*, 262 Va. 253, 260 (2001)). In making this determination, we view the "potential effect" of the challenged evidence "in light of all the evidence that was presented to the jury." *Id.* at 217 (quoting *Haas v. Commonwealth*, 299 Va. 465, 467 (2021)).

As the Commonwealth notes, most of the information in the Death Scene Investigation Report was also presented through the live testimony of the medical examiner, police officers, and crime scene technicians at the scene. Thus, Williams had the ability to cross-examine those witnesses regarding those facts. The report was certainly probative of the fact that Bowman died by homicide. But the medical examiner, who testified and was subject to cross-examination, concluded that the death was a homicide in the autopsy report itself. Williams offers no persuasive reason why the challenged report would cause the jury to conclude that the death was a homicide if the jury did not credit the medical examiner's conclusion.

Massey and Bailey both testified that they saw Williams shoot Bowman in the face. The Commonwealth adduced forensic, video, and circumstantial evidence that placed Williams at the

---

[8] We are obligated to decide cases "on the best and narrowest grounds available." *Butcher v. Commonwealth*, 298 Va. 392, 396 (2020) (quoting *Commonwealth v. White*, 293 Va. 411, 419 (2017)). "The 'best' answer to a legal question is the one with which the least number of jurists would disagree . . . . The 'narrowest' answer to a legal question is the one affecting the least number of cases." *Id.*

scene and explained his motive for killing Bowman. But the Commonwealth's murder case turned on whether the jury believed the eyewitness testimony. Williams has not identified any information in the report that was probative of his identity as the killer. Massey and Bailey confirmed that Williams fatally shot Bowman, and despite his attempts to impeach their testimony, the jury credited it. Given the overwhelming eyewitness testimony and corroborating evidence, we conclude that the Death Scene Investigation Report did not influence the jury. *See Kilpatrick*, 301 Va. at 216. Accordingly, any error in admitting the report was harmless.

III. Text Messages

Under Rule 2:404(b), "evidence of other crimes, wrongs, or acts is generally not admissible to prove the character trait of a person in order to show that the person acted in conformity" with that trait. But "if the legitimate probative value of such proof outweighs its incidental prejudice," it is "admissible if it tends to prove any relevant fact pertaining to the offense," including the defendant's motive.[9] Va. R. Evid. 2:404(b). For such evidence to be admissible, the trial court must determine that "the legitimate probative value of such proof outweighs its incidental prejudice." *Osman v. Commonwealth*, 76 Va. App. 613, 640 (2023) (quoting Va. R. Evid. 2:404(b)).

We disagree with Williams that the challenged texts were irrelevant to his motive.[10] To be relevant, the evidence "need not conclusively prove the ultimate fact in issue." *Thomas v.*

---

[9] Although motive is not an element of murder that the Commonwealth must prove, it is "a circumstance tending to prove the guilt of" the defendant. *Shahan v. Commonwealth*, 76 Va. App. 246, 260 (2022) (quoting *Tibbs v. Commonwealth*, 31 Va. App. 687, 704 (2000)).

[10] Williams's third assignment of error challenges the trial court's admission of "evidence of other crimes, wrongs, or acts in violation of Rule 2:404(b) in the form of text messages." Williams does not quote any of the challenged texts in his opening brief. The sole description of the texts was that they "dealt with drug dealing activity before and after the shooting." We will assume that this highly generalized description of the disputed evidence adequately identifies the challenged ruling of the trial court. *See* Rule 5A:20(c)(2). Given Williams's apparent concession that the challenged texts established that he engaged in drug trafficking activity at the

*Commonwealth*, 44 Va. App. 741, 754 (2005) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990)). Rather, evidence is relevant to a defendant's motive if it has any tendency to "make the existence of any fact in issue more probable or less probable than it would be without the evidence." Va. R. Evid. 2:401; *see Hargrove v. Commonwealth*, 77 Va. App. 482, 505 (2023).

The Commonwealth argued to the jury that Williams killed Bowman because he believed Bowman stole drugs from him. Massey's testimony was the principal evidence supporting this motive. But the Commonwealth was entitled to corroborate Massey's testimony in this regard, particularly given defense counsel's vigorous attempts to impeach him.

Williams does not contest that the challenged texts support the conclusion that he was engaged in drug trafficking at the time of the killing. To be sure, Williams' drug trafficking activity does not conclusively establish that Williams believed that Bowman stole drugs from him. But his drug trafficking activity makes that supposition more probable than without the evidence. Accordingly, the texts were relevant to Williams' motive and were admissible under Rule 2:404(b).

The trial court also did not abuse its discretion by determining that the legitimate probative value of the texts outweighed their incidental prejudice. Williams asserts that the texts "improperly suggested that he was "the type of person to have" and "use a gun." But Massey and Bailey both testified that they saw Williams possess a firearm and use it to kill Bowman. In the face of these eyewitness accounts, any inference that Williams possessed a firearm because he was a drug dealer had minimal, if any, prejudicial effect. Accordingly, the trial court did not err by admitting the texts under Rule 2:404(b).

---

time of Bowman's death, we conclude that the best and narrowest ground to resolve this assignment of error is addressing the merits. *See Butcher*, 298 Va. at 396.

## CONCLUSION

For the foregoing reasons, we affirm the trial court's judgments.

*Affirmed.*